[No. A130852. First Dist., Div. Two. Feb. 9, 2012.]

LAWRENCE HECIMOVICH, Plaintiff and Respondent, v.
ENCINAL SCHOOL PARENT TEACHER ORGANIZATION et al.,
Defendants and Appellants.

**COUNSEL**

Kirtland & Packard, Robert A. Muhlbach, Robert K. Friedl and Jennifer Boldi for Defendants and Appellants.

Lawrence Hecimovich, in pro. per., for Plaintiff and Respondent.

**OPINION**

**RICHMAN, J.**—A recent Google search for "youth sports" showed 379,000,000 results. "Safety in youth sports," 66,800,000. "Problem parents in youth sports," 21,600,000. And "problem coaches in youth sports," 108,000,000. Subjects of tremendous interest.

Plaintiff Lawrence Hecimovich, by profession an attorney, was in the 2008–2009 school year the volunteer basketball coach of a fourth grade basketball team in the afterschool program in Menlo Park. A discipline problem arose with one of the players on his team, and plaintiff's attempts to resolve the issue with the boy's parents only exacerbated the situation, to the point, plaintiff claimed, that the parents were "rallying team parents to remove" him. Plaintiff then involved the volunteer league commissioner, who involved other league officials. This led to an extensive review of the matter—and numerous e-mails—the upshot of which was that plaintiff was told he would not be allowed to coach the following year and a suggestion that, when he return, it be to coach older children. Plaintiff's response was this lawsuit.

Representing himself, plaintiff filed a complaint against four defendants, the parent-teacher organization and three volunteers involved in running the afterschool program, a complaint that purported to allege eight causes of action. Defendants filed an anti-SLAPP motion, asserting that the lawsuit dealt with an issue of public interest and that plaintiff could not demonstrate a likelihood of prevailing on the merits. The trial court observed that the "gravamen" of plaintiff's complaint was defamation, and went on to hold that defamation cannot be protected activity within the anti-SLAPP analysis. The court thus denied the motion under the first step of the analysis, and did not reach step two.

Defendants appeal, and we review the matter de novo, concluding first that defamation can be protected activity and that plaintiff's lawsuit arose out of an issue of public interest. And we go on—at plaintiff's express invitation—to decide the second step, and hold that plaintiff has failed to demonstrate a likelihood of prevailing on the merits. We thus reverse, with instructions to enter an order granting the motion to strike, and to hold a hearing to determine the attorney fees to which defendants are entitled for their success in having the lawsuit stricken.

## INTRODUCTION

We begin with a general description of what plaintiff's lawsuit is about, as alleged in the "Summary of Claims" in paragraph 6 of his verified complaint: "6. Hecimovich was the volunteer basketball coach for an Encinal School fourth grade team in the City of Menlo Park Community Services After-School Basketball Program during the 2008–2009 school year. Throughout the early part of the year, a player on the team engaged in behavior that went beyond disruption to posing a serious risk to his own safety and the safety of other players. That conduct included but was not limited to kicking and throwing basketballs at the gym lights, clock and fire alarm in an effort to break them; throwing or kicking balls at other players or other players' basketballs to disrupt their shooting or dribbling; and disappearing without notice during practices, including the final incident lasting half an hour. Hecimovich brought these issues to the attention of the player's parents numerous times and was at first ignored, then met with extreme anger and hostility, allegations that Hecimovich was discriminating against the player, and the threat that the parent had rallied and would continue to rally team parents to remove Hecimovich. When Hecimovich informed Encinal Basketball Coordinator Julie Roth of these developments, Roth refused to allow Hecimovich to take any action to address the situation, despite the fact that it clearly would not improve, lacking parent support. Roth . . . insisted, contrary to written policy, that a coach could not reduce a p[l]ayer's minutes due to misconduct. When Hecimovich informed Roth that the risk to player safety,

the disruption to practices and the impact on team cohesiveness was unacceptable and would not be allowed under the rules of [American Youth Soccer Organization] or other youth organizations, Roth accused him of 'unnecessarily escalating the situation' and threatened various punishments, including removing him as a coach. The following year, Roth, together with her successor, Leslie Burke, and PTO President Kelly Perri, found Hecimovich unfit to coach and permanently barred Hecimovich from participating in the Encinal League."

As will be seen, defendants take issue with certain of the specific accusations in plaintiff's summary, and also with the description of what was ultimately said to plaintiff. But defendants take no issue with the background that generated the communications and the dispute here: the conduct of a kid on a fourth grade basketball team, his parents' and his coach's reactions to it, and the ultimate resolution of the situation.

## BACKGROUND

### Plaintiff's Complaint

On August 27, 2010, representing himself, plaintiff filed a verified complaint for damages, including punitive damages. It named four defendants, identified by plaintiff as follows: Encinal School Parent Teacher Organization (PTO), a nonprofit organization; Kelly Perri, PTO president during the 2009–2010 school year; Julie Roth, PTO basketball commissioner during the 2008–2009 school year; and Leslie Burke, basketball commissioner during the 2009–2010 school year and currently (when referred to collectively, defendants). The complaint alleged eight causes of action, each against all defendants, styled by plaintiff as follows: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) retaliation in violation of public policy; (4) libel and slander; (5) negligence; (6) fraud; (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress.

The complaint was 20 pages long, with 88 paragraphs. The first five paragraphs identified the parties; paragraph 6 was plaintiff's summary of claims quoted above; paragraphs 7 through 45 were plaintiff's "factual allegations"; and the remaining paragraphs purported to allege the essential elements of the eight causes of action identified above. Significantly, all 39 "factual allegations" were incorporated into each of the eight causes of action, perhaps most significantly the final factual allegation, paragraph 45: "Hecimovich, who has coached soccer (along with basketball and baseball) each of the last five years and intended to coach throughout his sons' adolescence, has not coached again based on the defamation and other

unlawful conduct he experienced from defendants, and will not be able to coach until defendants acknowledge their deceit and clear his reputation."

Interestingly, at no point—not in paragraph 45, not in the cause of action for "libel and slander"—did plaintiff even attempt to allege what he claimed to be the defamatory communication(s).[1]

*The Motion to Strike*

On October 13, 2010, defendants filed a special motion to strike pursuant to Code of Civil Procedure section 425.16.[2] The motion argued that (1) the conduct alleged in plaintiff's complaint was "in connection with a public issue or an issue of public interest," as it involved communications between a parent-teacher organization and parents concerning plaintiff's coaching of young children and (2) plaintiff would not be able to show a likelihood of prevailing on the merits.

The motion was supported by declarations of the three individual defendants, Perri, Roth, and Burke, each of whom testified to their involvement with plaintiff and/or the brouhaha that ensued. As developed in more detail below, this testimony included problems with plaintiff and his coaching style; the welfare of the young players; and what Perri, for example, described as her conclusion: "[B]ased on my responsibilities and authority as president of the Encinal School Parent Teacher Organization, . . . it would be prudent and appropriate to advise Coach Hecimovich that he would not be able to coach in the program for at least one year. I simply did not believe that Coach Hecimovich [*sic*] coaching style, based on my investigation, was appropriate for young grammar school children. I so advised Coach Hecimovich and indicated that after one year, I would consider allowing him to, once again, coach in the program." The three declarations also testified that all communications in which the declarants participated regarding plaintiff and his coaching were made without malice and to "interested persons."

On November 1, 2010, plaintiff filed his opposition to the motion, consisting of a 14-page memorandum of points and authorities and his 16-paragraph declaration. He filed no declarations from any third persons. Plaintiff's declaration had attached nine exhibits which, according to him, were copies

---

[1] As Witkin distills the pleading rule, "It is sometimes said to be a requirement, and it certainly is the common practice, to plead the exact words or the picture or other defamatory matter. The chief reason appears to be that the court must determine, as a question of law, whether the defamatory matter is on its face or capable of the defamatory meaning attributed to it by the innuendo. Hence, the complaint should set the matter out verbatim, either in the body or as an attached exhibit." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 739, p. 159.)

[2] Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

of the following: the basketball league policies Roth distributed to coaches; four e-mails from plaintiff, one to the parents of the young player involved, one to all team parents, one to Perri, and one to Burke; two e-mails from Burke, one to plaintiff and one to Perri; and a grouping of several e-mails from Perri, including one sent to all parents.

On November 9, 2010, defendants filed their reply. Along with it, they filed objections to plaintiff's declaration, objecting to portions of his declaration identified by page and line, generally on the grounds of hearsay and lack of foundation.

### The Demurrer

Defendants had also filed a demurrer, which was scheduled to be heard on November 29, the same day as the motion.

### The Hearing on the Motion

The court had issued a tentative ruling on the motion, apparently denying it.[3] Defendants contested it, and the result was a relatively brief argument, which began with the court noting what its "thinking was here," which was this: "[Its] view was that there were some allegations that suggested that claim here has to do with some false statements that were made about . . . the plaintiff's performance and that that was why he wasn't able to coach anymore. [¶] . . . [¶] And so, even though it isn't pled as a defamation claim it, you know that's what the allegations sound in if I can use an old expression that we used to have."

Brief argument followed, with counsel for defendants citing authority for their position, after which the court turned to plaintiff to see what he "has to say here." After addressing the primary case relied on by defendants, plaintiff went on as follows:

"Secondly, the notion that anything somehow involves children or somehow involves a school raises an issue of free speech on a matter of critical public importance that would completely open up every case to a SLAPP motion. There would no longer be any lawsuits involving education or children or government or anything else in that whole domain.

"Certainly, that is not the law and I think in the opposition I have cited a host of cases that it's defendants' burden of showing that the gravamen of my claims which are, I think your Honor's comment about it being sounding [in]

---

[3] The tentative ruling is not in the record.

defamation comprises an attack on specific efforts to engage in free speech not significant public issues. And that is the case of *Wang v. Wal-Mart* [(2007)] 153 Cal.App.4th 790 [63 Cal.Rptr.3d 575]. Clearly that's not what is at issue here.

"What is at issue here is a very internal policy matter. There is a written policy that says that a coach could discipline children who engage in misconduct. The commissioner, upon being told a coach wants to discipline a child [who] is engaged in misconduct like limiting playing time, says, 'No, that is not the policy. That policy doesn't apply to us.' "

Counsel for defendants responded, principally focusing on the communications, all made in the context of decisions that "impacted a number of children and their parents." Plaintiff briefly responded, observing that if the court were to look, for example, at Roth's declaration, "this entirely relates to a complaint raised by the coach, that being me, about a need to implement discipline based upon student misconduct and Ms. Roth disagreed with that approach."

The court then said it was prepared to rule, and went on as follows: "My view on it really doesn't rest so much on [the extent of the communications] and I am aware of this, of the language in the statute that talks about activity that is done in connection with a matter of public interest, but if what you say is true then would it mean that we could never have a defamation lawsuit against a public figure in California and the standards of *New York Times v. Sullivan* being invoked and the problem I have with the . . . motion is that it's clear that the complaint sets out alleged defamation of character. And even if that is activity that is connected with freedom of speech, that kind of speech has never been protected by the First Amendment. And so, and that has been the case since at least the 1920's. The United States Supreme Court has held to that view. The California Supreme Court is held to that view and it seems to me that given what the claim here actually is, leaving aside some of the problems with the pleadings that I have noted. If you look at the essence of the claim, it's that there were false statements being publicly made that were published and this is a remedy, this special motion to strike is a remedy that was designed and is intended to protect protected speech not unprotected speech."

Counsel for defendants disagreed, to no avail, and the remainder of the brief hearing dealt with the court's oral rulings on defendants' objections to evidence, which apparently were all "overruled" in the tentative ruling, but with no grounds given.

At the conclusion of the hearing, the court confirmed the basis of its ruling: "Because the basis of the claim is purported defamation that it's not a claim

as to which the special motion to strike applies because defamation by its definition is something that for years has been held not to be protected by the first amendment and in order for you to make a threshold showing you have got to show that there is a connection to some protected First Amendment activity and that showing isn't made here."

On January 7, 2011, the court filed its two-page order, the substance of which provided in its entirety as follows:

"1. The Motion to Strike by Defendants pursuant to C.C.P. § 425.16 is denied. The Court finds that Defendants failed to meet their burden of showing that Plaintiff [*sic*] claims arises [*sic*] from Defendants' exercise of free speech or petition rights as defined by C.C.P. § 425.16. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61 [124 Cal.Rptr.2d 507, 52 P.3d 685].) A fair reading of the Complaint is that the *gravamen* of Plaintiff's claim is a purported defamation of character, something that, if true, is not protected by the First Amendment,

"2. The Defendants [*sic*] objections to the Declaration of Lawrence Hecimovich are overruled. Specific grounds for the Court overruling these objections was [*sic*] set forth, on the record, during the hearing on the subject motion.

"3. Plaintiff's request for judicial notice of certain documents is denied."

On January 7, 2011, defendants filed their notice of appeal.

### The Demurrer and the Amended Complaint

As indicated above, defendants had also filed a demurrer. As to it, the court sustained the demurrer to all eight causes of action in the complaint, without leave to amend as to the third cause of action, and with leave to amend as to the other seven.

On December 8, 2010, and before defendants filed their notice of appeal, plaintiff filed his verified first amended complaint for damages.

### Plaintiff's Motion to Augment

In his brief to us, plaintiff chastises defendants for "improperly omit[ting] from the record plaintiff's first amended complaint filed December 8, 2010, one month before the appeal." And on July 6, 2011, plaintiff filed a motion to augment the record on appeal, to include (1) the first amended complaint and (2) a copy of a January 2011 article from an online newspaper, The Almanac

Online, entitled "Encinal Coach's Lawsuit Ruling Appealed," along with online comments about the article. Defendants opposed the motion, and on July 14 we ordered that we would take the motion under submission and decide it with the merits of the appeal.

On September 9, 2011, plaintiff filed what he called a "Supplemental Memorandum and Post-Motion Evidence in Support of His Motion to Augment the Record." This sought to augment the record to "reflect [plaintiff's] efforts to obtain discovery" concerning the "authorship of the defamatory January 2011 online articles," which discovery was disallowed by the trial court.

We now deny the motion to augment.

The reason plaintiff sought to add the first amended complaint was, in his words, for "the sole purpose of adjudicating the *second* prong of the anti-SLAPP test—assessing [plaintiff's] likelihood of success on the merits. [Plaintiff] cited to *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 870–871 [90 Cal.Rptr.3d 205]. *Nguyen-Lam* is directly on point." *Nguyen-Lam* is not on point. *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604 [129 Cal.Rptr.2d 546] is.

■ *Roberts* was, as here, an appeal from a denial of a SLAPP motion. And plaintiff Roberts's first contention was that the appeal was "moot, frivolous, and should be dismissed because prior to the . . . filing [of the] notice of appeal, she filed a second amended complaint, which is now the operative pleading." (*Roberts v. Los Angeles County Bar Assn., supra,* 105 Cal.App.4th at p. 612 (*Roberts*).) Rejecting that claim, the court held that "An implied stay in the proceedings where the plaintiff files an amended complaint prior to the defendant's appeal of the denial of a SLAPP motion to strike is necessary so that a plaintiff cannot deprive a defendant of the right to the appellate review granted by the Legislature so that the appellate court can determine if the defendant had made a prima facie showing. [¶] There would be little benefit in a right to appeal if the plaintiff could get around appellate review by filing an amended pleading. Nor would a competitive rush to the courthouse fulfill the legislative purpose of a quick and inexpensive method of unmasking and dismissing SLAPP suits." (*Id.* at p. 613; accord, *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1074 [112 Cal.Rptr.2d 397] [appeal from grant of SLAPP motion].)

■ *Nguyen-Lam v. Cao,* the case relied upon by plaintiff, is not to the contrary. There, the trial court had entered an unusual order, described by the Court of Appeal as follows: "The trial court couched its ruling as an order granting defendant's motion to strike, but with leave for plaintiff to amend

her complaint to cure any deficiency concerning actual malice. . . . But authorizing an amendment under these circumstances is tantamount to denying the strike motion, and we therefore reach the propriety of the ruling based on defendant's challenge." (*Nguyen-Lam v. Cao, supra,* 171 Cal.App.4th at pp. 869–870.) The court went on to affirm the denial of the SLAPP motion, pointedly noting that it did so because the evidence showing that plaintiff could prevail on the merits was before the trial court at the time of the motion: "True, a plaintiff may not avoid or frustrate a hearing on the anti-SLAPP motion by filing an amended complaint (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049 [18 Cal.Rptr.3d 882]) but where, as here, the evidence prompting amendment is found in the declarations already submitted for the hearing, there is no risk the purpose of the strike procedure will be thwarted with delay, distraction, or increased costs. (Cf. *ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.* (2006) 138 Cal.App.4th 1307, 1323 [42 Cal.Rptr.3d 256] [plaintiff cannot amend pleading to avoid pending anti-SLAPP motion]; *Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 772 [131 Cal.Rptr.2d 201] [plaintiff cannot use 'eleventh-hour amendment' to plead around anti-SLAPP motion].)" (*Nguyen-Lam v. Cao, supra,* 171 Cal.App.4th at pp. 871–872.) In short, the court concluded, "the trial court did not err in permitting plaintiff to amend her complaint to plead actual malice in conformity with the proof presented at the hearing on the strike motion." (*Id.* at p. 873.)

■ This, of course, is not the setting here, and the first amended complaint has no place before us, as plaintiff at one point apparently concedes, observing that "the original complaint remains the operative pleading for purposes of assessing whether [defendants] engaged in protected activity subject to the SLAPP statute."

As to the January 2011 online newspaper article and the numerous comments that followed it—all published after the appeal was filed—they have nothing to do with the two issues involved in the SLAPP analysis.[4] *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005 [5 Cal.Rptr.3d 668], cited by plaintiff in his reply brief for the proposition that "nothing in the statute or case law suggests that the factual analysis for ruling on the motion must be frozen in time on the date the complaint is filed," is easily distinguishable. *Slauson* held that a trial court ruling on a SLAPP motion— there, in a case involving an injunction—could rely on *postcomplaint* evidence in ruling on the motion. (*Id.* at p. 1021.) Not postappeal evidence.

---

[4] We also note that plaintiff's attempt to add this material does not comply with California Rules of Court, rule 8.252(a) or Evidence Code section 459.

In sum, we analyze the matter based on plaintiff's complaint and the papers filed below in connection with the SLAPP motion, an analysis to which we now turn.

## DISCUSSION

*SLAPP Law and the Standard of Review*

Subdivision (b)(1) of section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP, including, as pertinent here, "(4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

■ A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*).)

■ "The Legislature enacted section 425.16 to prevent and deter 'lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by ending them early and without great cost to the SLAPP target" ' [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958].)

Finally, and as subdivision (a) of section 425.16 expressly mandates, the section "shall be construed broadly."

With these principles in mind, we turn to a review of the issues before us, a review that is de novo. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988 [119 Cal.Rptr.3d 835] (*Grewal*).)

### Defamation Suits Can Be Within SLAPP

As noted, the first step in the SLAPP analysis is to determine whether the lawsuit is within one of the four descriptions of protected activity in subdivision (e) of section 425.16. The trial court held it was not, because it sounded in defamation which, the court held, is not—and apparently can never be—protected activity. Such holding was wrong.

■ Numerous cases have made the SLAPP analysis in defamation cases, as manifest by the 12 pages of cases discussed in notes 29 through 35 of the annotations to section 425.16 in West's Annotated California Codes. (See Notes of Decisions, 14B West's Ann. Code Civ. Proc. (2004 ed. & 2012 Supp.) foll. § 425.16, pp. 413–417 & Supp. pp. 124–130.) Indeed, as our colleagues in Division One confirmed in the course of a lengthy discussion of the history and purpose of the SLAPP procedure, defamation is the very first of the " 'favored causes of action in SLAPP suits.' " (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 890 [17 Cal.Rptr.3d 497]; accord, *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1400, fn. 9 [126 Cal.Rptr.2d 560] [" 'The favored causes of action in SLAPP suits are defamation . . . .' "].)

As another Court of Appeal observed, " 'defamation suits are a prime target of SLAPP motions. [¶] . . . The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the inquiry as to whether the plaintiff has established a probability of success would be superfluous.' " (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 419–420 [9 Cal.Rptr.3d 242], quoting *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906].) In short, the basis on which the trial court denied the motion was wrong.

But that does not end the inquiry, as we must determine on our de novo review whether plaintiff's lawsuit involves an "issue of public interest."

### Plaintiff's Lawsuit Involves an Issue of Public Interest

■ Like the SLAPP statute itself, the question whether something is an issue of public interest must be " ' "construed broadly." ' " (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23 [53 Cal.Rptr.3d 752]; see *Rivera v. First*

*DataBank, Inc.* (2010) 187 Cal.App.4th 709, 716 [115 Cal.Rptr.3d 1] (*Rivera*).) An " ' "issue of public interest" ' " is " '*any issue in which the public is interested.*' " (*Rivera*, at p. 716, quoting *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042 [72 Cal.Rptr.3d 210].) A matter of " ' "public interest should be something of concern to a substantial number of people. [Citation.] . . . [T]here should be some degree of closeness between the challenged statements and the asserted public interest [citation] . . . ." "[T]he focus of the speaker's conduct should be the public interest . . . ." ' [Citation.] Nevertheless, it may encompass activity between private people." (*Rivera, supra*, 187 Cal.App.4th at p. 716.)

▓ We look for "the *principal thrust* or *gravamen* of the plaintiff's cause of action." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494].) We "do not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's cause of action." (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679 [105 Cal.Rptr.3d 98].) The "critical consideration" is what the cause of action is "*based on.*" (*Navellier, supra*, 29 Cal.4th at p. 89.)

Applying those principles here leads easily to the conclusion that the communications and conduct about which plaintiff complains were in connection with an issue of public interest.

We begin with the "factual allegations" in plaintiff's complaint, the first of which refers to Roth, and her involvement with plaintiff in connection with a problem he had with his young player and the player's parents. These allegations confirm that the issue included the parents telling Roth that in their opinion plaintiff posed a danger to their child's physical safety. In fact, plaintiff himself stated that he "could not coach a player whose parents considered [plaintiff] unsafe."

The next factual assertions, those concerning Burke, involve statements attributed to her in her capacity as the PTO basketball commissioner, all concerning plaintiff's problems with the player and his parents. These include a recitation of alleged conversations between Burke and plaintiff's assistant coach Picciotto, a communication from Burke to Perri to the effect that plaintiff was "bullying two moms," and the decision to "remove" him as a coach.

The next allegations are about Perri, again of conduct and statements attributed to her in an official capacity as PTO president. And these allegations conclude with the statement, "Perri determined that Hecimovich was unfit to coach and informed Hecimovich's team parents of that conclusion." In short, plaintiff's own complaint concedes that the communications in issue

here concern the well-being of young children in an afterschool sports program, as discussed between and among members of the PTO, parents of the young team members, and league officials.

As noted above, the declarations of individual defendants Roth, Perri, and Burke confirm in great detail that the issue with the player and plaintiff's fitness to coach young players was the basis of the dispute. And plaintiff's own declaration makes the point graphically, with 15 of his 16 paragraphs describing the dispute in detail. These paragraphs include plaintiff's sworn testimony that the player's parents were alleging that plaintiff was "discriminating against the players"; that assistant coach Picciotto had been told by Burke that a player's father had "filed a formal written complaint insisting that [plaintiff] not be allowed to coach again, and that Roth had reported that [plaintiff] had used improper disciplinary tactics against the player"; and that Perri contacted parents of the players to "inform them that the PTO had banned [plaintiff] from coaching (head or assistant coach) due to what was considered unacceptable conduct coaching their sons."

This is an issue of public interest.

Defendants relied below, and rely here, on *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 [33 Cal.Rptr.3d 145] (*Terry*), where the essence of plaintiffs' complaint was that they were falsely accused of having an inappropriate sexual relationship with a minor female in their work as church youth group leaders. (*Id.* at p. 1538.) The evidence showed that parents had complained about the plaintiffs' dealings with the minor, which prompted a church investigation, the result of which was a confidential report of the church describing an inappropriate relationship with the minor. (*Id.* at pp. 1539–1542.) The report was then discussed among interested church members, first in a February 19, 2004 closed meeting of church officials and then at "two meetings on February 22, 2004, with parents of youth group members. The Church had received many inquiries from parents and concluded they had a right to know about the investigation. Defendants distributed copies of the report at the meetings and took care to collect all copies as the meetings ended. About 100 people saw the report." (*Id.* at p. 1543.)

The plaintiffs sued the church, the pastor, and church leaders for libel, slander, and intentional and negligent infliction of emotional distress, and sought injunctive relief after the distribution of the report at the meetings. The defendants responded with a SLAPP motion, which the trial court granted. The Court of Appeal affirmed, finding that "the communications clearly involved issues of public interest, because they involved the societal interest in protecting a substantial number of children from predators . . . ." (*Terry, supra,* 131 Cal.App.4th at pp. 1538–1539, 1547.) Doing so, the court

first rejected the argument that the case involved only matters of private interest: "Plaintiffs characterize the issue in this case as a private relationship between George Terry and the girl. Not so. The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe. It need not be proved that a particular adult is in actuality a sexual predator in order for the matter to be a legitimate subject of discussion." (*Id.* at p. 1547.)

And the court went on: "Here, the broad topic of the report and the meetings was the protection of children in church youth programs, which is an issue of public interest. This is not to say that George Terry in fact molested the girl. Rather, George Terry's actions in engaging in a secretive and inappropriate relationship with the girl gave the Church and parents of youth group members cause for concern and opened for discussion the topics of whether other children were affected and how to prevent such inappropriate relationships." (*Terry, supra,* 131 Cal.App.4th at p. 1548.)

Plaintiff says nothing in any attempt to distinguish the holding or reasoning of *Terry*, contenting himself with criticism of defendants for their reliance on the case and taking umbrage at being equated with a child molester.[5] That, of course, *is not the point. The point is that, like the safety of children at issue in Terry,* the safety of children in sports is also an issue of public interest—which issue, as shown by plaintiff's own pleading and declaration, was at the heart of his dispute with defendants.

Indeed, it would appear that plaintiff essentially agrees that the suitability of his coaching style was a matter of public interest among the parents. As plaintiff testified, he himself urged the team parents to join in an investigation of his suitability to coach the young players because it involved "the well being of our kids." In his words: "Please, if you would, take the time to answer [Perri's] questions fully and truthfully, and don't hold anything back on the grounds that it might be hurtful to me. I think that if the PTO wants to

---

[5] Among other things, plaintiff describes defendants' brief as spending "four pages comparing [plaintiff] to the child molester in *Terry*," and asserts that defendants' "attempt to analogize [plaintiff's] conduct to the conduct in *Terry* is shameless and repulsive, and highlights the seemingly endless capacity of ignorant people to say ignorant things." Then, after a brief statement of his description of *Terry*, plaintiff ends with this: "Here, by contrast, the only persons who displayed wanton disregard for child safety are Roth, who received [plaintiff's] report of unsafe playing conditions in February 2009 but elected to ignore the complaint so as not to disturb a wealthy parent, and Liner, who elected to defer to Roth rather than exercise her prerogative as Encinal School Principal and member of the PTO Board to reverse Roth's misguided priorities in the interest of child safety."

ensure the well being of our kids (at least in this one, highly-selective occasion) everyone should be forthcoming."

As noted, plaintiff has requested that we augment the record to include, among other things, a January 2011 article in The Almanac Online about the lawsuit and numerous followup comments about it. While we decline the request to augment, we do note that the scope and breadth of the comments, not to mention the article itself, show just how much the public was interested in the issue.

■ In sum, we conclude that safety in youth sports, not to mention problem coaches/problem parents in youth sports, is another issue of public interest within the SLAPP law. (See also *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 236–240 [83 Cal.Rptr.2d 677] [domestic violence]; *M. G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623 [107 Cal.Rptr.2d 504] [molestation in youth sports]; *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39 [134 Cal.Rptr.2d 420] [dietary supplement]; *Wilbanks v. Wolk, supra*, 121 Cal.App.4th at pp. 898–899 [quality of seller's products]; *Terry, supra*, 131 Cal.App.4th at p. 1547 [protection of children from predators]; *Gilbert v. Sykes, supra*, 147 Cal.App.4th 13 [plastic surgery]; *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97 [64 Cal.Rptr.3d 467] [firing of college football coach].)

*Plaintiff Has Failed to Demonstrate a Likelihood of Prevailing on the Merits*

The second step in the SLAPP analysis is to determine whether plaintiff has shown a probability of prevailing on the claim. Here, because the trial court found, however erroneously, that plaintiff's lawsuit was not within the SLAPP statute, it did not reach step 2. Nevertheless, we can decide the issue (see *Roberts, supra*, 105 Cal.App.4th at pp. 615–616) and, in fact, plaintiff "asks [us] to address the likelihood of success on the merits prong on the anti-SLAPP test." We thus decide step 2. And conclude that plaintiff has failed to meet his burden.

*Introduction to Analysis*

■ We confirmed the applicable law in *Grewal, supra*, 191 Cal.App.4th at page 989: "We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it

defeats the plaintiff's submission as a matter of law.' (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700 [61 Cal.Rptr.3d 29].) [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.' (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at p. 699.) In the words of the Supreme Court, plaintiff needs to show only a 'minimum level of legal sufficiency and triability.' (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5 [97 Cal.Rptr.2d 179, 2 P.3d 27].) In the words of other courts, plaintiff needs to show only a case of 'minimal merit.' (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675 [35 Cal.Rptr.3d 31], quoting *Navellier v. Sletten*[, *supra,*] 29 Cal.4th 82, 95, fn. 11 . . . .)"

While plaintiff's burden may not be "high," he must demonstrate that his claim is legally sufficient. (*Navellier, supra,* 29 Cal.4th at p. 93.) And he must show that it is supported by a sufficient prima facie showing, one made with "competent and admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236 [132 Cal.Rptr.2d 57]; see *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497 [45 Cal.Rptr.2d 624].) Plaintiff's demonstration does not measure up.

As noted, the trial court thought the "gravamen" of plaintiff's lawsuit was defamation. Plaintiff seemingly did not disagree below, as reflected in his argument, where he apparently adopted the court's analysis. Here, by contrast, plaintiff vigorously disagrees, and asserts that defendants' claim that defamation is the gravamen of his suit is "manifestly false, rendering their failure to address [plaintiff's] other causes of action fatal to their appeal." And, plaintiff goes on, "[T]he Complaint makes clear that [plaintiff's] principal grievance relates to the baseless decision to bar him from the Encinal and Hillview programs based on the erroneous insistence that [plaintiff] had improperly benched a player. In fact, [plaintiff] repeatedly offered to forgive the loss of a season coaching his sons' teams, withdraw his grievances and forego legal action—first, not to file the complaint, then, not to serve it, then, to dismiss the complaint and forego damages—if [defendants] simply allowed him to return to coaching in year two, then, in year three. [Defendants] rejected those overtures. . . ." Two brief paragraphs follow, the second of which says this: "To pretend that the Complaint can be reduced to a single theory of injury, and that the gravamen of [plaintiff's] claims sounds in defamation, is a mere fiction. The court below accepted that characterization so as to expeditiously deny the motion, since the defamation allegations clearly fall outside the SLAPP statute. However, had [defendants] not failed miserably in their attempt to strike the defamation allegations, they would have had to address the remaining claims."

Despite the position urged in his brief, plaintiff did not meaningfully address any of the other claims. Nor, for that matter, did defendants. We thus requested supplemental briefing on the issue, and with it proceed to analyze the second step in the SLAPP analysis, beginning with the claim which plaintiff labels "libel and slander."

### The Defamation Claim

As quoted above, paragraph 45 of plaintiff's complaint, incorporated by reference into all other causes of action, states: "Hecimovich, who has coached soccer (along with basketball and baseball) each of the last five years and intended to coach throughout his sons' adolescence, has not coached again based on the defamation and other unlawful conduct he experienced from defendants, and will not be able to coach until defendants acknowledge their deceit and clear his reputation."

 Civil Code section 44 provides that defamation can be of two types, libel or slander. Libel is defined in Civil Code section 45, slander in section 46.[6] To prevail on a claim for defamation, plaintiff must show four elements: that defendants published the statements; that the statements were about plaintiff; that they were false; and that defendants failed to use reasonable care to determine the truth or falsity. (CACI No. 1704.)

We begin by noting that we are at a loss to discern just what defamatory communication(s) plaintiff is complaining about. At no point in his briefing does he specifically identify any particular writing or utterance; and as will be seen, he has provided no evidence demonstrating a prima facie case of defamation—indeed, he did not even plead one. (See fn. 1, *ante*.)

Plaintiff's entire pleading of the alleged "libel and slander" is this: "PTO, Roth, Burke and Perri have knowingly made false statements, separate and

---

[6] Civil Code section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

Civil Code section 46 provides: "Slander is a false and unprivileged publication, orally uttered . . . which:

"1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;

"2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;

"3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

"4. Imputes to him impotence or a want of chastity; or

"5. Which, by natural consequence, causes actual damage."

apart from their investigatory efforts, if any, in order to damage Hecimovich's standing in the community. Roth, Burke and Perri's statements were defamatory per se in that they attributed to Hecimovich immoral qualities including a disregard for the safety of children that by natural consequence would and have in fact injured Hecimovich's reputation in the community and his ability to engage in the avocation of his choice." That is it. No specifics. No reference to what, where, or when. No reference to oral or written. Nothing.

Plaintiff's declaration is no better. The word "defame" or "defamation" is not even mentioned. And the only reference to any claimed "falsity" is this: "12. During our meeting Perri conceded that she was aware of no facts that would support Burke's claim that Hecimovich had attempted to institute disciplinary tactics against the child that were punitive and against the league's rules and philosophy, or that he had precluded a parent from enjoying continued participation in the basketball experience. Picciotto has confirmed that Burke's reasons were false. Perri later confirmed he [*sic*] conclusion that Roth and Burke's reasons for banning Hecimovich were false. True and correct copies of Perri's November 18, 21 and 23, 2009 emails are attached as Exhibit C."[7] Such alleged falsity does not come within Civil Code section 46.

Plaintiff did allege, however conclusorily, that the PTO and the women volunteers asserted to team parents that he is "unfit to coach." However, he is not a professional coach, but a lawyer who volunteered to coach children. The statement does not have a tendency to injure plaintiff in his profession nor expose him "to hatred, contempt, ridicule, or obloquy," or cause him to be "shunned or avoided."

Plaintiff also alleged, also conclusorily, that the women volunteers defamed him by attributing to him "immoral qualities including a disregard for the safety of children that by natural consequence would and have in fact injured [plaintiff's] reputation in the community and his ability to engage in the avocation of his choice." While such a statement might be defamatory, plaintiff has produced no *evidence* of any defendant attributing to plaintiff "immoral qualities including a disregard for the safety of children."

But even assuming that plaintiff could produce admissible evidence of the essential elements of a claim for defamation, his claim would fail because of the privilege in Civil Code section 47, subdivision (c): a "privileged publication . . . is one made . . . [¶] . . . [¶] (c) [i]n a communication, without malice,

---

[7] Interestingly, despite plaintiff's occasional attributions to his assistant coach Picciotto, plaintiff's brief acknowledges that "both parties' characterizations of Picciotto's statements are subject to being stricken as hearsay, an objection both parties made at hearing." As to this, plaintiff is correct.

to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."

As noted above, all three defendants testified that all communications by them were to "interested persons" who either requested the information or were entitled to it. These included school officials, PTO members responsible for the boys' basketball program, the assistant coach, parents of the child player, and league parents. Plaintiff provided no contrary evidence.

■ Furthermore, all three declarants testified to an absence of malice. Again, plaintiff put forth no contrary evidence, no evidence showing " 'a feeling of hatred or ill will going beyond that which the occasion for the communication apparently justified . . . .' " (*Katz v. Rosen* (1975) 48 Cal.App.3d 1032, 1037 [121 Cal.Rptr. 853].) To defeat a SLAPP motion, plaintiff must overcome substantive defenses (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 447–448 [122 Cal.Rptr.3d 73]), and his claim would fail for his inability to show malice, as have the claims of many other plaintiffs who lost SLAPP motions because of such inability. (See *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 275 [105 Cal.Rptr.2d 674]; *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1162 [15 Cal.Rptr.3d 100]; *Stewart v. Rolling Stone LLC, supra,* 181 Cal.App.4th at pp. 689–690; *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 226–227 [105 Cal.Rptr.3d 683] [malicious prosecution].)

All plaintiff says in response to defendants' privilege argument is this: "[Defendants] cannot possibly establish that their admittedly false statements and dishonest actions were undertaken in good faith and without malice. See, e.g., *Rancho La Costa Inc. v. Superior Court* (1980) 106 Cal.App.3d 646 [165 Cal.Rptr. 347], *cert. denied* 450 U.S. 902 [67 L.Ed.2d 326, 101 S.Ct. 1336] (assertion that conditional privilege was apparent from complaint with bare bones evidentiary submission amounts to claim of carte blanch [*sic*] application, precise contrary of what section 47(c) allows)." From there plaintiff goes on with three brief ipse dixit arguments that "Roth's story," "Burke's story," and "Perri's story" are "inherently self-contradictory and make[] no sense." That is it. It is insufficient.

*The Remaining Claims Have No Merit*

As noted, plaintiff now disagrees as to the gravamen of his lawsuit, and argues that defendants must also address the other claims as well. As also noted, we have received supplemental briefing about these claims, and will address them, following a few preliminary observations.

First, whatever their label, as plaintiff's paragraph 45, incorporated into all causes of action, expressly states, all the causes of action arise from the same fundamental setting—a setting involving an issue of public interest. *Lee v. Fick* (2005) 135 Cal.App.4th 89 [37 Cal.Rptr.3d 375] is instructive. The plaintiff there was a high school baseball coach who sued the parents of a player who urged school officials to fire the coach. His complaint included claims for libel, slander, conspiracy to interfere with prospective economic advantage, and intentional interference with prospective economic advantage. The defendants filed a SLAPP motion as to these causes of action, which the trial court granted as to one cause of action and denied as to the others. Both sides appealed. The Court of Appeal reversed in favor of the defendants, noting that the facts alleged to support the two causes of action for libel and slander were the same as those asserted to support the causes of action for alleged interference with economic advantage. (*Id.* at pp. 93, 99; see also *Gerbosi v. Gaims, Weil, West & Epstein, LLP, supra*, 193 Cal.App.4th at p. 447 [causes of action for intentional infliction of emotional distress, negligence, malicious prosecution, and abuse of process all arise from same facts].)

Second, plaintiff's understanding of the SLAPP law is erroneous, especially his bold statement that "breaching a contract is *never* a protected exercise of free speech or right of petition and hence cannot constitute a protected activity for anti-SLAPP purposes," citing *Applied Business Software, Inc. v. Pacific Mortgage Exchange, Inc.* (2008) 164 Cal.App.4th 1108, 1117 [79 Cal.Rptr.3d 849]. That case says no such thing. And well-settled law is contrary.

■ As the Supreme Court put it in *Navellier, supra*, 29 Cal.4th at page 92: "As the facts in this lawsuit illustrate, conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning. The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning."

That contract claims can be within the SLAPP procedure is also illustrated by *Nygård, Inc. v. Uusi-Kerttula, supra*, 159 Cal.App.4th 1027. There, an employer sued its former employee (and a magazine) for statements made by the former employee in an interview, alleging five causes of action: breach of contract, breach of the implied covenant of good faith and fair dealing, interference, breach of the duty of loyalty, and defamation. (*Id.* at p. 1033.) The trial court struck the entire complaint under the SLAPP statute. The Court of Appeal affirmed, holding that the interview was a protected activity because magazines are public fora within the meaning of Code of

Civil Procedure section 425.16, subdivision (e)(3), and the statements con-
cerned an issue of public interest. (*Nygård, Inc. v. Uusi-Kerttula, supra*, at
pp. 1041–1043.)

⬛ Third, plaintiff's understanding of what can be considered in con-
nection with the second step in the SLAPP analysis is also erroneous. That is,
plaintiff asserts that "[f]or purposes of the second stage of the SLAPP test,
the Court should look to the allegations of the First Amended Complaint to
determine whether Respondent demonstrates a likelihood of success on the
merits." As noted, the first amended complaint is not before us, and thus
irrelevant here. More to the point, plaintiff cannot rely on his pleading at all,
even if verified, to demonstrate a probability of success on the merits. (*Pavia v.
Nichols* (2008) 168 Cal.App.4th 1007, 1017 [85 Cal.Rptr.3d 838]; *Roberts,
supra*, 105 Cal.App.4th at pp. 613–614.)[8]

With that by way of background, and the trial court having sustained the
demurrer to the third cause of action without leave to amend, we turn to an
analysis of the remaining six causes of action, an analysis we make mindful
that plaintiff's burden requires him to demonstrate that the claim is " 'legally
sufficient.' " (*Navellier, supra*, 29 Cal.4th at p. 93.) And conclude that
plaintiff has not demonstrated a likelihood of prevailing on any of them.

The first cause of action is for breach of contract. It contains two
paragraphs, as follows:

"47. Encinal basketball coaches are allowed to continue coaching in the
absence of good cause for dismissal. Hecimovich is not aware of any
basketball coach not being allowed to continue to coach, despite various
violations of Encinal rules and policies. Hecimovich's proposal to reduce a
player's playing time due to misconduct conformed with Encinal policy, as
well as League policy. When Roth insisted, equivocally, that the policy
Hecimovich relied on either did not apply to Encinal, did not apply to his
team, or meant the opposite of what it says, Hecimovich deferred to her
decision. The player was never disciplined in any respect, and Hecimovich
did not violate any Encinal or League policy.

---

[8] *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1289–1290 [74 Cal.Rptr.3d 873], does state
to the contrary. We note that *Salma* has not been followed by any other published decision, and
that every other case holds to the contrary. We disagree with *Salma*, as apparently does the
leading practical treatise: "Comment: The anti-SLAPP statute should be interpreted to allow
the court to consider the 'pleadings' in *determining the nature of the 'cause of action'*—i.e.,
whether the anti-SLAPP statute applies. But affidavits stating evidentiary facts should be
required to oppose the motion (because pleadings are supposed to allege ultimate facts, not
evidentiary facts)." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The
Rutter Group 2011) ¶ 7.1021.1, p. 7(II)-48 (rev. # 1, 2011), boldface omitted.)

"48. As a result of Defendants' actions as set forth above, Hecimovich has suffered general damages according to proof."

Passing over whether a *volunteer* coach of a fourth grade basketball team in an afterschool league can have an enforceable contract, plaintiff's claim fails, for several reasons. Plaintiff has produced no evidence demonstrating the formation of any contract—no evidence of offer, acceptance, or consideration, no evidence from which the terms of any contract could be determined. Beyond that, he has pleaded no damages compensable in contract (see generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 869 et seq., p. 956 et seq.), and has provided no evidence of any damages to him. (*Anschutz Entertainment Group, Inc. v. Snepp* (2009) 171 Cal.App.4th 598, 643 [90 Cal.Rptr.3d 133].)

██ The second cause of action is for violation of the covenant of good faith and fair dealing. To the extent the claim sounds in contract, it is coextensive with plaintiff's first cause of action. To the extent plaintiff is alleging a tort claim, it fails, as such a tort exists only in insurance contracts. (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102–103 [44 Cal.Rptr.2d 420, 900 P.2d 669]; *Sutherland v. Barclays American/Mortgage Corp.* (1997) 53 Cal.App.4th 299, 314 [61 Cal.Rptr.2d 614].)

The fifth cause of action, for negligence, alleges in pertinent parts as follows:

"66. Hecimovich's complaints to Roth involved Encinal student safety in a District and Encinal-sponsored activity conducted on Encinal school property. Defendants have a heightened standard of care with regard to providing safe premises and maintaining policies sufficient to ensure student safety. [¶] . . . [¶]

"68. Burke's decision to bar Hecimovich from coaching based on Roth's reports, and her failure to discover the inaccuracy and inadequacy of those reports, was similarly negligent in that Burke had a duty to address student safety issues in her capacity as PTO basketball coordinator.

"69. Perri's decision to bar Hecimovich from coaching based on Roth's and Burke's reports, and her failure to discover the inaccuracy and inadequacy of those reports, was similarly negligent in that Perri had a duty to address student safety issues in her capacity as PTO President.

"70. As a result of defendants' actions as set forth above, Hecimovich has suffered general and special damages according to proof. . . ."

Any claim by plaintiff would fail because he did not plead a duty to him for so-called "safety issues." (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [50 Cal.Rptr.2d 309, 911 P.2d 496].) Likewise it would fail because plaintiff has shown no damages. (*Anschutz Entertainment Group, Inc. v. Snepp, supra,* 171 Cal.App.4th at p. 643.)

The sixth cause of action is for fraud. It alleges as follows:

"72. Roth, Burke and Perri dissuaded Hecimovich from taking legal action regarding their decision to ban him from coaching during the 2009–2010 season by representing that they would fairly review that decision and would fairly consider him for future seasons. Perri represented that an impartial investigation was required and that she would conduct such an investigation. After convincing Hecimovich to refrain from challenging the PTO's actions, Perri never conducted such an investigation. Hecimovich is informed and believes that Perri never intended to do so.

"73. As a result of defendants' actions as set forth above, Hecimovich has suffered general and special damages according to proof. Hecimovich has also suffered and continues to suffer damages to his reputation, according to proof. Hecimovich is also entitled to recover his reasonable attorneys' fees in bringing this matter to trial."

■ Plaintiff's claim fails because he has failed to allege with the requisite specificity " '*facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 [49 Cal.Rptr.2d 377, 909 P.2d 981].) Moreover, as we understand the so-called misrepresentations, they were made to dissuade plaintiff "from taking legal action." He has, of course, taken the action, and so there is no reliance on the claimed representation, a necessary element of a fraud claim. (CACI No. 1900.) And, again, there is no evidence of compensable damage. (*Anschutz Entertainment Group, Inc. v. Snepp, supra,* 171 Cal.App.4th at p. 643.)

■ The seventh cause of action, for intentional infliction of emotional distress, requires several things missing here. First, the complained-of conduct must be outrageous, that is, beyond all bounds of reasonable decency. (*Cervantez v. J. C. Penny Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975]; Rest.2d Torts, § 46, com. d, pp. 72–73 ["no occasion for the law to intervene in every case where some one's feelings are hurt"].) Second, the conduct must result in severe emotional distress. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58].) And third, the tort calls for intentional, or at least reckless, conduct. (5 Witkin, Summary of Cal. Law, *supra,* Torts, § 453, p. 672.) None of these is evidenced here.

██ The eighth cause of action, labeled by plaintiff as "negligent infliction of emotional distress," does not even exist. "The negligent causing of emotional distress is not an independent tort but the tort of negligence, involving the usual duty and causation issues. Recovery is generally allowed where there is physical impact. (See e.g., *Di Mare v. Cresci* (1962) 58 [Cal.2d] 292, 297, 300 [23 Cal.Rptr. 772, 373 P.2d 860] [fall injuring hip and leg, leaving plaintiff suspended in air and causing emotional trauma]; . . . *Lawson v. Management Activities* (1999) 69 [Cal.App.4th] 652, 656 [81 Cal.Rptr.2d 745] [policy of designating tort as negligent infliction of emotional distress often incorrectly results in its being treated as independent tort].)" (6 Witkin, *supra*, Summary of Cal. Law, Torts, § 1004, p. 270, citation omitted.)

## DISPOSITION

The order denying the SLAPP motion is reversed, and the matter remanded with instructions to (1) enter an order granting the motion and (2) hold a hearing, following further briefing, to award defendants the attorney fees to which they are entitled under section 425.16.

Kline, P. J., and Haerle, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 25, 2012, S200922.