Filed 8/10/15  Hunter v. National Basketball Players Assn. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| G. WILLIAM HUNTER,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NATIONAL BASKETBALL PLAYERS ASSOCIATION,<br><br>Defendant and Appellant. | B254155<br><br>(Los Angeles County<br>Super. Ct. No. LC100771) |

APPEAL from an order of the Superior Court of Los Angeles County, Huey Cotton, Jr., Judge.  Affirmed.

Orrick, Herrington & Sutcliffe, Lynne C. Hermle, Joseph C. Liburt, Leah L. Spero, Christina G. Sarchio; Weil, Gotshal & Manges, James W. Quinn and Bruce S. Meyer for Defendant and Appellant.

Sidley Austin, David L. Anderson, Marie L. Fiala, Joshua Hill and Michelle B. Goodman for Plaintiff and Respondent.

INTRODUCTION

In its appeal from an order denying its special motion to strike (Code Civ. Proc., § 425.16),[1] defendant National Basketball Players Association (the NBPA or union) contends the trial court erred by allowing plaintiff G. William Hunter to amend his breach of contract causes of action instead of dismissing the suit as a strategic lawsuit against public participation. A review of Hunter's complaint reveals that the four contract causes of action alleged against the NBPA do not arise from activity protected by the anti-SLAPP statute. Accordingly, for a different reason than that relied on by the trial court, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Hunter's contract with the NBPA*

The NBPA is the collective bargaining labor union for the players in the National Basketball Association (the NBA). It hired Hunter to be its Executive Director in late 1996. The parties signed a written contract for a three-year term (the contract). Three extensions were made to Hunter's contract including an extension in 2010 (the 2010 extension), which extension contract was signed by NBPA President Derek Fisher.[2] The 2010 extension continued Hunter's employment term to June 30, 2015.

2. *Hunter's complaint*

In late 2010, the NBPA entered into negotiations with the NBA for a new collective bargaining agreement. During negotiations, disagreements arose between the NBA owners and the union and in July 2011, the NBA owners locked the players out of the teams' facilities and eventually out of games.

The complaint alleges further that Hunter and Fisher differed about how to resolve the impasse. Hunter believed that Fisher had much to lose from a protracted lockout and

---

[1]     All further statutory references are to the Code of Civil Procedure.

[2]     In addition to being the then President of the NBPA, Fisher was a basketball player variously for the Los Angeles Lakers, the Golden State Warriors, the Utah Jazz, the Dallas Mavericks, and eventually the Oklahoma City Thunder.

a personal interest in maintaining good relations with the NBA. In retaliation for their disagreement, Fisher and his publicist Jamie Wior allegedly waged a campaign to oust Hunter as the Union's Executive. Fisher and Wior initiated an audit of the NBPA. Although the NBPA's Executive Committee cancelled the audit and issued a unanimous vote of no confidence in Fisher, Fisher refused to resign. Wior orchestrated a campaign in the press designed to undermine Hunter and muddy his reputation. As the result of the negative attention generated by the news articles, the Executive Committee retained a law firm to conduct an internal investigation (the internal investigation).

The report of the internal investigation, released on a website, concluded that Hunter committed no criminal acts but had made some missteps in his duties as Executive Director. The report also concluded that the Board of Player Representatives had never properly approved Hunter's current employment contract with the NBPA as required by the union's constitution and by-laws, and that Hunter was aware that his current contract was never properly approved and knowingly failed to disclose this information to the NBPA's Executive Committee and player representatives.

After placing Hunter on administrative leave, Fisher and other members of the NBPA's Executive Committee sent Hunter a letter in February 2013, terminating him from employment "effective immediately." The letter, attached to Hunter's complaint, asserted that the 2010 contract extension was "not properly negotiated, executed, or approved, [with the result] that contract is null, void, invalid, and unenforceable. Therefore, you are an at-will employee and being terminated accordingly." Continuing, the letter explained that "there are grounds to terminate your employment 'for cause.' To the extent a tribunal in a future proceeding determines that the [contract] is enforceable, this letter shall be construed as notice of a 'for cause' termination . . . ." Hunter's lawsuit against the NBPA, Fisher, and Wior ensued. Neither Fisher nor Wior is a party to this appeal.

Of the 14 causes of action in Hunter's complaint, four were aimed solely at the NBPA and involved contract theories of liability only: (1) breach of express contract, (2) repudiation, (3) breach of implied-in-fact contract, and (4) breach of the covenant of

3

good faith and fair dealing.  Hunter sought damages, but not injunctive relief or reinstatement as Executive Director.  None of the remaining eight causes of action is at issue in this appeal.

In particular, Hunter alleged the existence of an employment contract, both express and implied, and attached copies of the initial contract and each extension agreement at issue.  Hunter alleged he performed all duties and obligations required of him under the contract, and in three causes of action, that the union "breached the Employment Contract by discharging Hunter before the end of his employment term under the Employment Contract" and extensions.  In the cause of action entitled repudiation, Hunter alleged the union "asserted without qualification that they never entered into a contract with Hunter and denied the very existence of the Employment Contract and [2010] Extension" and "clearly and positively indicated to Hunter that they would not meet the requirements of the contract, thereby expressly repudiating the Employment Contract and the 2010 Extension," "thus interfering with and preventing Hunter from receiving the benefits he was entitled to receive under the Employment Contract and the 2010 Extension."

3. *The NBPA's special motion to strike*

The NBPA filed its anti-SLAPP motion and demurred to the complaint.  In conjunction with the demurrer, the NBPA requested the trial court take judicial notice of a federal indictment of Joseph Lombardo and Carolyn Kaufman by the United States Attorney's Office, and copies of publications from news outlets pertaining to Hunter's job performance and termination and referring to a federal investigation into the NBPA.  These documents, attached to the union's request for judicial notice, formed the basis of the trial court's determination that Hunter's lawsuit arose out of protected activity as they were made in an official proceeding.  (§ 425.16.)

In its anti-SLAPP motion, incorporating the arguments raised on demurrer, the NBPA argued that Hunter's lawsuit arose out of protected activity because Hunter's causes of action against the union were premised on his allegations about the internal investigation.  The union conducted the internal investigation as the result of a

4

combination of events: Fisher's call for an inquiry into the union's business practices, some articles in the New York Times, Bloomberg News, and Yahoo! Sports about Hunter and the NBPA, and a subpoena issued to the union by the United States Attorney for the Southern District of New York calling for the production of financial and other business records, which subpoena led to more media coverage. The 229-page report of the internal investigation concluded that Hunter acted in a manner inconsistent with his fiduciary duties and knew his contract was not properly executed pursuant to the union's constitution and by-laws. Thus, the union argued, all of Hunter's claims were premised on acts that were either statements or writing made before an official proceeding or an issue under review by an official proceeding; statements made in a public forum on a matter of public interest; or conduct in furtherance of the exercise of constitutional right of free speech in connection with an issue of public interest. (§ 425.16.)

The NBPA also argued that Hunter could not meet his burden to establish a probability of success on his contract causes of action.

4. *Hunter's opposition*

Hunter opposed the anti-SLAPP motion by arguing that his contract causes of action arose from the NBPA's termination of his employment, not from the exercise of any First Amendment right.

As for the probability of his prevailing on the merits, Hunter submitted copies of the contract and extensions, his declaration and those of three members of the NBPA Executive Committee in 2010 to show that he had an express, and alternatively, an implied-in-fact employment contract, that the union had ratified the 2010 extension, and that the parties' course of conduct manifested the intent to enter into the 2010 extension. Hunter also demonstrated that the union breached its contractual obligations when it "terminated Hunter's employment without compensation." The contract provided that the NBPA could terminate Hunter with or without cause.[3] If it terminated him for cause,

---

[3] Paragraph 7.a of the 2010 extension provides, "Upon termination for cause, Employer's sole and exclusive obligation will be to pay Employee his compensation earned through the date of termination, any accrued but unused vacation, and any

5

then the NBPA would be obligated to pay Hunter all compensation earned through the date of termination, any accrued but unused vacation, and any outstanding reimbursements.  If termination were without cause, the NBPA would be obligated to pay Hunter his base compensation and benefits for the remaining term of the contract, plus accrued but unused or unpaid vacation or compensation, and any unreimbursed expenses already incurred.  The NBPA did not have cause to terminate his employment because none of the grounds for cause cited in the contract existed, he asserted.  But even if it had cause, Hunter declared that the NBPA has not paid him anything since it terminated his employment.  Hunter also asserted that the NBPA expressly repudiated the 2010 extension before the union's performance was due by sending him the letter terminating his employment.  Finally, he argued that if the absence of Board approval for the 2010 extension rendered the contract unenforceable, then the union breached the covenant of good faith and fair dealing by failing to secure the necessary approvals to ensure the contract's enforceability.

5. *The NBPA's reply*

The union countered that Hunter's opposition was an attempt to "restyl[e]" or "re-write" his complaint.  Rather than to allege wrongful termination, the union argued, Hunter's reply recharacterized the breach of contract causes of action as being based on the NBPA's decision to terminate him without compensation.

6. *The ruling*

The trial court denied the NBPA's special motion to strike.  The court first found that the "grav[a]m[e]n of the breach of contract claims *are simply that the NBPA terminated the contract*."  (Italics added.)  However, the court then ruled that those same

outstanding reimbursements, and Employee shall not be entitled to any compensation after the date of such termination."

Under paragraph 7.b., the  "Employer's sole and exclusive obligation will be to pay Employee his base compensation and benefits (to the extent benefits are allowed to continue under law) for the remaining term of this Agreement, and Employee shall not be entitled to any other compensation after the date of such termination, except any accrued, but unused or unpaid, vacation or compensation, and any unreimbursed expenses incurred in conformance with this Agreement prior to such termination."

6

causes of action were based on protected activity. Quoting at length from *Greka Integrated, Inc. v. Lowrey* (2005) 133 Cal.App.4th 1572, the court reasoned that the conduct that formed the basis of the contract allegations involved the widely publicized interest in Hunter's job performance and the subpoena from the United States Attorney's office.

The court observed that Hunter's opposition to the anti-SLAPP motion shifted focus of his complaint from wrongful termination to breach by failure to pay him the compensation due under the contract. As Hunter had not pled the latter type of breach, the court allowed him to amend his complaint to conform to the prima facie showing of the probability of prevailing on the merits that he made in opposition to the special motion to strike. The court reasoned that Hunter's opposition to the special motion to strike had demonstrated an enforceable contract that required payment in the event of termination and that "[t]here is ample evidence on each of the four [contract] claims." The NBPA's timely appeal ensued.

CONTENTION

The NBPA contends that the trial court erred as a matter of law in permitting Hunter to amend his complaint.

DISCUSSION

Section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

There are two steps to the analysis of an anti-SLAPP motion brought under section 425.16, subdivision (b)(1). "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of

7

prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

We review an order granting or denying an anti-SLAPP motion de novo. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) We consider the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not weigh credibility nor compare the weight of the evidence. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

The NBPA's appeal concerns solely the second of the two prongs under the anti-SLAPP procedure. The union contends that Hunter failed to allege a theory of breach of contract on which he could prevail with the result the court was required to grant its motion to strike and award it fees and costs. Despite this result, the NBPA contends, the court allowed Hunter to amend to assert a "new" theory of breach, namely the failure to pay him the compensation due under the contract. This is an interesting question, which we need not address because we agree with Hunter that none of his four contract-based causes of action arises from protected activity and hence none is subject to an anti-SLAPP motion to strike.[4]

Section 425.16, subdivision (e) defines acts in furtherance of the rights of petition and free speech to include "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized

---

[4] Hunter's argument in his respondent's brief that his complaint does not arise from protected activity is made as an alternative basis for affirmance. A respondent may assert error in aid of affirmance. (*City of Glendale v. Crescenta etc. Water Co*. (1955) 135 Cal.App.2d 784, 798.)

8

by law," in connection with an issue under consideration or review by such bodies or officials, or in a "public forum in connection with an issue of public interest."[5]

Analysis of the first prong focuses on the substance of the lawsuit. "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's *act underlying the plaintiff's cause of action* must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]" (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78, italics added.) "[T]he critical point is whether the plaintiff's cause of action itself was *based on an act* in furtherance of the defendant's right of petition or free speech." (*Ibid.*, italics added.) "The 'principal thrust or gravamen' of the claim determines whether section 425.16 applies." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103.) To resolve the issue, we look to the allegations in the complaint. (§ 425.16, subd. (b)(2).) We examine the complaint in a fair and commonsense manner and we broadly construe the anti-SLAPP statute (*Id.*, subd. (a)).

Notwithstanding the anti-SLAPP statute must be construed broadly (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 187), its boundaries are not limitless. "[A] defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant. [Citation.] . . . [W]hen the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the

---

[5] Subdivision (e) of section 425.16 reads, "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

9

cause of action to the anti-SLAPP statute." (*Id.* at p. 188.) Likewise, the "*motive* the defendant may have had in undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities" *is irrelevant.* (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 269, italics added; see *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1183 ["an alleged act is incidental to a claim, and incidental to any unprotected activity . . . only if the act is not alleged to be the basis for liability."].) "That a cause of action arguably may have been *triggered* by protected activity does not entail that it is one arising from such." (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78, italics added.) The decisive question is not what the defendant's motive was for the act, but whether "the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*Ibid.*)

In *Episcopal Church Cases* (2009) 45 Cal.4th 467, after a local church disaffiliated itself from the larger general church, the two churches claimed ownership of the local church's property and the building on the property. (*Id.* at p. 472.) The defendants argued that the lawsuit arose from the protected activity of expressing disagreement with the higher church authorities concerning church governance and then in disaffiliating from the general church. (*Id.* at p. 477.) The Supreme Court disagreed, holding that while the protected activity "lurk[ed] in the background of this case, the actual dispute concern[ed] property ownership rather than any such protected activity" within the meaning of section 425.16. (*Id.* at p. 473.)

The Supreme Court explained, " '[t]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] . . . In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.' [Citation.] In filing this action, the Los Angeles Diocese sought to resolve a *property dispute*. The property dispute is based on the fact that both sides claim ownership of the same property. This dispute, and not any protected activity, is 'the gravamen or principal thrust' of the action. [Citation.] The additional fact that protected activity may lurk in the background—and may explain why the rift

10

between the parties arose in the first place—does not transform a property dispute into a SLAPP suit.  Accordingly, the trial court erred in treating this as a SLAPP suit subject to section 425.16's special motion to dismiss."  (*Episcopal Church Cases*, *supra*, 45 Cal.4th 467, 477-478.)

Here, the pleadings and declarations in connection with the anti-SLAPP motion show that in bringing his four causes of action against the NBPA, Hunter sought to resolve a contract dispute based the union's act of repudiating and terminating his employment contract before the end of its term.  As the trial court acknowledged, the gravamen "or principal thrust" of the lawsuit here is that the union terminated the contract.  The contract causes of action are *based on* the alleged breach of the 2010 extension by terminating it before the end of the term.  The unamended complaint alleges:  "Fisher and the NBPA breached the Employment Contract by discharging Hunter before the end of his employment term under the employment Contract and 2010 Extension . . . ." and "positively indicated to Hunter that they would not meet the requirements of the contract, thereby expressly repudiating the Employment Contract and the 2010 Extension," "thus interfering with and preventing Hunter from receiving the benefits he was entitled to receive under the Employment Contract and the 2010 Extension."  Hunter's disagreement with the NBPA is not protected activity; it is a garden-variety contract dispute.

The NBPA goes to great lengths[6] to bring the four contract causes of action within the ambit of protected activity.  It argues that Hunter admitted that the union "terminated him" as a "*direct result*" of the internal investigation.  (Italics added.)  Yet, the internal investigation and its report is not an "official proceeding *authorized by law*" as contemplated by section 425.16, subdivision (e).  (Italics added.)  The union is not a governmental agency, and the proceedings of its executive committee are not reviewable

---

[6]    It was the NBPA, not Hunter's complaint or affidavits, that brought the United States Attorney's investigation and subpoena, the indictment, and the myriad news articles to the trial court's attention in its request to take judicial notice attached to its demurrer.

11

by writ of mandate. (*Olaes v. Nationwide Mutual Ins. Co*. (2006) 135 Cal.App.4th 1501, 1508.) The NBPA's protocol was not equivalent to a state statute. (See *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1396, fn. 8.) Nor was the union " 'acting in the capacity of a governmental official performing an "official duty." ' [Citation.]" (*Olaes v. Nationwide Mutual Ins. Co*., *supra*, at p. 1508; compare *Vergos v. McNeal, supra*, at p. 1396 ["Statutory hearing procedures qualify as official proceedings authorized by law for § 425.16 purposes"] & *Kibler v. Northern Inyo County Local Hospital Dist*. (2006) 39 Cal.4th 192, 198-201 [statutory procedure for hospital peer review qualified as official proceeding under § 425.16.].)[7]

The union also quotes from the complaint's allegations that Fisher and Wior " 'orchestrated a series of actions that would eventually lead to Hunter's termination by the NBPA.' " Such actions, the union asserts, included statements made to the press, which statements precipitated a criminal investigation by the government, the internal investigation, and actions and statements made by the union based on the internal investigation. Accepting that the *NBPA was motivated* to terminate the contract in part by the results of the internal investigation, which investigation in turn was *triggered* in part by the subpoenas from the United States Attorney's Office, the NBPA's motive is irrelevant in the analysis of the first anti-SLAPP prong. "[C]auses of action do not arise from motives; they arise from acts." (*Wallace v. McCubbin*, *supra*, 196 Cal.App.4th at p. 1186.) Nor is motive an element of breach of contract. (Cf. *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1367 [listing four elements of a cause of action for breach of contract].)

_____

[7] The trial court's citation to title 29 of the United States Code section 431(a)(5) does not support its conclusion that the union's internal investigation was an official proceeding. Section 431(a)(5) provides that a labor organization who disciplines or removes officers or agents for breach of trust must *file a report* with the Secretary of Labor showing the provisions made and procedures followed. This reporting requirement does not impose an affirmative duty to conduct an investigation or mandate the procedures that must be used in an investigation. (29 U.S.C. § 431(a)(5)(H).)

12

The NBPA next argues that the four contract causes of action arise from an issue of public interest simply because of statements Fisher and Wior made to the press or the statements made in the internal investigation. (§ 425.16, subd. (e).) Citing *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, the NBPA argues that Hunter served in a high profile job and his leadership was a matter of public interest. *Hecimovich* is inapposite. A question there was whether defamation suits can be subject to a special motion to strike. (*Id*. at p. 464.) The plaintiff's retaliation, defamation, and breach of contract lawsuit involved an issue of public interest because the acts underlying the plaintiff's causes of action were "communications and conduct," namely statements parents and the parent teacher organization made about the plaintiff's fitness as a fourth grade basketball coach. (*Id*. at pp. 465-466, 473-474.) The court stated, "the safety of children in sports is also an issue of public interest -- which issue, as shown by plaintiff's own pleading and declaration, was at the heart of his dispute with defendants." (*Id*. at p. 467.) As for the plaintiff's contract cause of action, there was no evidence of a contract. (*Id*. at p. 475.) Here by contrast, the issue at the heart of Hunter's four breach of contract causes of action against the NBPA was the union's *act* of terminating Hunter's employment contract before the end of its term for which he seeks contract damages. This is not a public issue and not protected activity, even if Hunter is a public figure. (*McConnell v. Innovative Artists Talent & Literary Agency, Inc*. (2009) 175 Cal.App.4th 169, 180 ["no one would suggest that a statement or writing firing an employee is protected First Amendment activity."].)

Our conclusion here is not influenced by *Nesson v. Northern Inyo County Local Hospital Dist*. (2012) 204 Cal.App.4th 65 (*Nesson*), disapproved on other grounds in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 686, fn. 18, upon which the NBPA relies. *Nesson* was a radiologist who sued the hospital because a medical executive committee summarily suspended his medical staff privileges causing the hospital to terminate his contract. (*Nesson*, at p. 56.) Each of the causes of action was founded on Nesson's contention that he could not be terminated *based on* the peer review's summary suspension of his privileges. (*Id*. at p. 83.) Unlike *Nesson*, which

13

arose from a hospital peer review hearing concerning the staff physician, which process is an " 'official proceeding authorized by law' " (*id*. at pp. 77-78), Hunter's lawsuit does not arise out of the internal investigation, which in any event, is not an official proceeding authorized by law.  Also, unlike *Nesson*, Hunter's allegations are not that the union terminated his contract based on the internal investigation or based on Fisher's and Wior's campaign to oust him, but that the union terminated the contract *in violation of the contract's terms*.

In ruling that Hunter's complaint arose out of protected activity, the trial court here found that the CBA negotiations, Hunter's leadership, the federal subpoena, and the possibility of Hunter's termination were matters of public interest, widely reported in the press, and "qualify as 'conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.' "  (Italics added.)  However, "[i]f the allegations of protected activity are merely incidental to a cause of action based essentially on nonprotected activity, the allegations will not transform the non-protected cause of action into an action subject to the anti-SLAPP law.  [Citations.]  The focus on the gravamen of the action does not implicate 'some philosophical thrust or legal essence of the cause of action.'  [Citation.]  Instead, courts are to focus on the acts on which liability is alleged to be based.  [Citation.]" (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823.)  The investigation and the questions about Hunter's leadership, while lurking in the background of this case, are incidental to and not alleged as *a basis* for Hunter's claims for breach of the employment contract.

Finally, the trial court's reliance on *Greka Integrated, Inc. v. Lowrey*, *supra*, 133 Cal.App.4th 1572, was misplaced.  There, the statements that gave rise to the lawsuit were protected activity (§ 425.16, subd. (e)) because they contained information the defendant disclosed to his attorney, in deposition, trial testimony, and in response to subpoenas during an investigation by the district attorney.  (*Greka,* at pp. 1576 & 1580.)  Here, by contrast, Hunter's breach of contract causes of action against the NBPA do not arise from any *statements* made during the internal investigation or elsewhere.

14

As we have concluded that Hunter's four contract causes of action do not "aris[e] from" protected activity (§ 425.16, subd. (b)(1)), we need not reach the second prong of the anti-SLAPP analysis. We will affirm the decision if the trial court was correct for any reason, regardless of the correctness of the grounds upon which it reached its conclusion. (*Hardin v. PDX*, *Inc*. (2014) 227 Cal.App.4th 159, 166.)

DISPOSITION

The order is affirmed. Hunter as prevailing party shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

EGERTON, J.<sup>*</sup>

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.