[No. B150039. Second Dist., Div. Seven. Jan. 21, 2003.]

VICKI M. ROBERTS, Plaintiff and Respondent, v.
LOS ANGELES COUNTY BAR ASSOCIATION, Defendant and
Appellant.

**COUNSEL**

Wilion, Kirkwood, Kessler & Hoffman, Gary Kessler and Allan E. Wilion for Defendant and Appellant.

Vicki M. Roberts, in pro. per.; and Richard G. Sherman for Plaintiff and Respondent.

## OPINION

**WOODS, J.**—Defendant Los Angeles County Bar Association (Bar Association) appeals from an order denying its special motion to strike under Code of Civil Procedure section[1] 425.16 (the anti-SLAPP [strategic lawsuit against public participation] statute). The court found the anti-SLAPP statute did not apply to plaintiff Vicki M. Roberts's complaint for breach of contract and fraud. The complaint arose from defendant's rating of plaintiff as "not qualified" when she ran for judicial office in 2000. We conclude that the statute applies to this action and that plaintiff did not establish a prima facie case. Accordingly, we reverse with directions to enter an order granting the motion.

### FACTUAL AND PROCEDURAL SYNOPSIS

#### I. *The Bar Association's Rating Process*

Through its judicial election evaluations committee (Committee), the Bar Association evaluates all candidates in contested elections for Los Angeles County judgeships and publicly disseminates its evaluations through its website, membership mailings and the media.

The evaluation process is described in the judicial election evaluations committee handbook (Handbook) and the rules of the judicial election evaluations committee (Rules).

The Committee consists of at least 20 members whose race, gender, ethnicity and practice areas represent a cross-section of the legal community. Each candidate is given the names of all committee members and may request the disqualification of any member who she believes has a potential conflict of interest. If the Committee chair disqualifies a member, "the member shall not participate in either the work of the subcommittee or the deliberations and the vote of the committee on such candidate."

The Committee investigates and evaluates all candidates whose names appear on the ballot, regardless of whether any particular candidate agrees to personally participate in the evaluation process. The Committee may consider any candidate's failure to cooperate when making its evaluation and may comment on any such failure in its final report.

---

[1] All statutory references are to the Code of Civil Procedure.

Candidates are rated as "well qualified," "qualified" or "not qualified."

The evaluation process consists of several steps. The full Committee is divided into subcommittees, with each subcommittee assigned responsibility for investigating specific candidates. The investigation includes obtaining information from personal data questionnaires submitted by each candidate; obtaining and verifying information via written questionnaire responses from and personal interviews with lawyers, judges and others with knowledge about the candidate; a personal interview with the candidate; and other reasonable steps to obtain pertinent information about each candidate's qualifications for judicial office.

Once sufficient information has been obtained, a subcommittee interview of the candidate is scheduled. A letter outlining the negative information obtained must be sent to the candidate at least 48 hours prior to the personal interview. If less than 48 hours notice is given, or if additional information is received between the sending of the letter and the scheduled interview, the vice-chair has discretion to postpone the personal interview.

The subcommittee presents a report to the full Committee, which includes summaries of the candidate's professional background and experience, the investigation, the candidate's positive and negative qualities, and the proposed tentative rating along with the reasons for the rating. After discussion, the full Committee votes on the tentative evaluation for each candidate, and the candidate is notified of the result. A majority of all members voting is required for a "qualified" rating, and a supermajority of 60 percent is required for "well qualified" or "not qualified" evaluations.

Each candidate receiving a tentative evaluation other than "well qualified" is advised in writing concerning the basis for the tentative evaluation and may appeal that evaluation to the full Committee. In advance of the appeal hearing, the candidate may submit additional written material to the Committee, including her responses to any negative comments that were raised in the 48-hour letter, the personal interview or the letter informing the candidate of the reasons for a "not qualified" tentative evaluation.

The candidate may also attend an appeal hearing before the full Committee during which she may present further arguments and materials in response to all the negative comments raised during the evaluation process.

After the appeal hearing, the Committee discusses the information accumulated and reaches a final evaluation, which may be different from the tentative rating. Final evaluations are sent to each candidate, and a final

report is prepared and released to the public. The Rules provide that a brief statement of the underlying reasons for a not qualified evaluation or rating shall be set forth in the final report.

## II. *Evaluation of Roberts*

Roberts was one of six candidates for Los Angeles Municipal Court Judge, Office No. 1, in the March 7, 2000, Primary Election.

On November 17, 1999, the Bar Association sent Roberts a letter advising her the Committee would be evaluating all candidates running in contested elections for Los Angeles County judgeships.

On November 22, Roberts sent the Committee written objections to seven Committee members, along with a copy of her pending lawsuit against the Los Angeles County District Attorney's Office and others. At the time of Roberts's evaluation, the Committee had 43 members.

Gerald Chaleff, chairman of the Committee, notified Roberts all her challenges to Committee members had been upheld and "none of those disqualified members would even be in the room during any portion of [her] evaluation."

The subcommittee assigned to Roberts began investigating her qualifications. On January 5, 2000, the Committee sent Roberts a letter advising that negative comments had been received about her lack of judicial temperament, to wit: (1) she did not exercise proper and professional judgment; (2) her temperament was erratic, and she had a "hair trigger" personality; (3) she had a chip on her shoulder; and (4) sometimes she was condescending.

On January 10, Roberts attended a personal interview with the subcommittee; the interview had originally been scheduled for January 6, but was continued to January 10 at the request of the subcommittee. At the interview, the subcommittee discussed issues, including: (1) pleadings prepared by Roberts were rambling; (2) she was overly passionate about issues as opposed to being dispassionate about applying legal principles to the facts; and (3) she exhibited inappropriate dress in the courtroom.

On January 24, the Committee advised Roberts she had been tentatively evaluated as "not qualified" because she did not possess judicial temperament and professional judgment, "indicative of fitness to perform the judicial function satisfactorily. More specifically, the information before the committee indicated an erratic and confrontational demeanor, defensive

responses to criticism and inappropriate and unprofessional litigation tactics. Further, the information indicated that you have exercised poor judgment by harassing and threatening people beyond the bounds of professionalism and advocacy."

Roberts appealed the Committee's tentative evaluation. By February 4, Roberts had retained an attorney who sent a four-page letter, plus exhibits, to the Committee in support of her appeal.

On February 8, Roberts appeared at her appeal hearing before the full Committee. Roberts submitted additional evidence, which she felt completely contradicted and strongly refuted all the negative allegations which had been raised about her qualifications. Roberts had an opportunity to make an oral presentation as to why the Committee should change its tentative evaluation.

Roberts inquired whether any disqualified Committee member was present in the hearing room. Chairman Chaleff replied Rory Olivarez had been present during Roberts's presentation. Chaleff assured Roberts that Olivarez would not participate in the Committee's deliberations or vote on Roberts's evaluation.

After the presentation, Roberts and Olivarez left the hearing room, and the Committee proceeded to deliberate as to its final evaluation. Olivarez did not participate in the deliberations or the vote. The final Committee vote was either unanimous or very close to unanimous in favor of a "not qualified" rating.

On February 9, the Bar Association notified Roberts she had been given a "not qualified" rating because she lacked judicial temperament. Subsequently, the Committee released its final report rating all the candidates to the public via its Web site, the media, and through mailings to its members.

The primary election was held on March 7. No candidate for municipal court office No. 1 received a majority. The two candidates with the most votes—Roberts and David Mintz—faced each other in a runoff election in November. Mintz won the runoff election.

III. *The Instant Lawsuit*

On February 10, 2000, the day after the Committee evaluated Roberts as "not qualified," she filed a complaint against the Bar Association. Subsequently, Roberts filed her first amended complaint, asserting causes of action for breach of contract, injunction, declaratory relief and fraud and alleging

the Bar Association's published "not qualified" evaluation caused damage to her reputation, entitling her to a court order declaring the evaluation null and void, a court order requiring an immediate retraction and a review of the evaluation process.

The Bar Association filed a motion to strike pursuant to the anti-SLAPP statute on the basis the suit arose from acts in furtherance of its constitutional right of free speech. The Bar Association demurred to all causes of action on the basis each failed to state a cause of action. The court denied the motion to strike on the basis the action was not a SLAPP suit and sustained with leave to amend the demurrers to the causes of action for breach of contract, declaratory relief and fraud. The court sustained the demurrer to the injunction cause of action without leave to amend.

On April 20, 2001, Roberts filed a second amended complaint.

On May 7, the Bar Association filed a timely notice of appeal from the order denying its motion to strike.

## DISCUSSION

I. *The operative pleading is the first amended complaint.*

■ Roberts contends this appeal is moot, frivolous, and should be dismissed because prior to the Bar Association's filing a notice of appeal, she filed a second amended complaint, which is now the operative pleading. ■ Generally, "[a]n amended complaint 'supersedes the original and furnishes the sole basis for the cause of action. [Citations.] The original complaint is dropped out of the case and ceases to have any effect as a pleading, or as a basis for a judgment. [Citation.]' " (*Anmaco, Inc. v. Bohlken* (1993) 13 Cal.App.4th 891, 901 [16 Cal.Rptr.2d 675].)

■ In *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1074 [112 Cal.Rptr.2d 397], the court concluded the omission of any provision in section 415.16 for leave to amend a SLAPP complaint was not the product of inadvertence or oversight and refused to read into section 415.16 an implied right of leave to amend. The court reasoned: "Allowing a SLAPP plaintiff leave to amend the complaint once the court finds the prima facie showing has been met would completely undermine the statute by providing the pleader a ready escape from section 415.16's quick dismissal remedy. Instead of having to show a probability of success on the merits, the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious nature of the suit through more artful

pleading. This would trigger a second round of pleadings, a fresh motion to strike, and inevitably another request for leave to amend. [¶] By the time the moving party would be able to dig out of this procedural quagmire, the SLAPP plaintiff will have succeeded in his goal of delay and distraction and running up the costs of his opponent. [Citation.] Such a plaintiff would accomplish indirectly what could not be accomplished directly, i.e., depleting the defendant's energy and draining his or her resources. [Citation.] This would totally frustrate the Legislature's objective of providing a quick and inexpensive method of unmasking and dismissing such suits." (*Simmons*, at pp. 1073-1074.)

In contrast, the appeal here is from the denial of a motion to strike. However, the *Simmons* court noted: "Unlike demurrers or motions to strike, which are designed to eliminate sham or facially meritless allegations, at the pleading stage a SLAPP motion, like a summary judgment motion, pierces the pleadings and requires an evidentiary showing." (*Simmons v. Allstate Ins. Co.*, *supra*, 92 Cal.App.4th 1068, 1073, italics omitted.)

An implied stay in the proceedings where the plaintiff files an amended complaint prior to the defendant's appeal of the denial of a SLAPP motion to strike is necessary so that a plaintiff cannot deprive a defendant of the right to the appellate review granted by the Legislature so that the appellate court can determine if the defendant had made a prima facie showing.

There would be little benefit in a right to appeal if the plaintiff could get around appellate review by filing an amended pleading. Nor would a competitive rush to the courthouse fulfill the legislative purpose of a quick and inexpensive method of unmasking and dismissing SLAPP suits. Moreover, there is nothing in the record to support Roberts's suggestion this appeal was filed as a bad faith tactic to prevent otherwise lawful discovery from commencing. Thus, we conclude that the operative pleading for this appeal is the first amended complaint and that the appeal is not frivolous.

II. *The anti-SLAPP statute applies to this action.*

"In bringing a section 425.16 motion to strike, the defendant has the initial burden to make a prima facie showing that the plaintiff's claims are subject to section 425.16. [Citation.] If the defendant makes that showing, the burden shifts to the plaintiff to establish a probability he or she will prevail on the claim at trial, i.e., to proffer a prima facie showing of facts supporting a judgment in the plaintiff's favor." (*Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1087 [114 Cal.Rptr.2d 825].) In assessing the probability of prevailing, a court looks to the evidence that would be presented at

trial, similar to reviewing a motion for summary judgment; a plaintiff cannot simply rely on its pleadings, even if verified, but must adduce competent, admissible evidence. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 656 [49 Cal.Rptr.2d 620], disapproved on another point in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Denials of anti-SLAPP motions are reviewed de novo. (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 845 [111 Cal.Rptr.2d 582].)

Under section 425.16, subdivision (b)(1), a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike." The statute defines an "act in furtherance" as including "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

█ " 'The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. "Public discussion about the qualifications of those who hold or wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment." ' " (*Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 673 [64 Cal.Rptr.2d 222].) *Macias* notes "[s]ection 425.16 applies to suits involving statements made during a political campaign," and cites cases where the anti-SLAPP statute was applied to statements made in connection with a recall election, in a political flyer concerning a candidate and in a recall petition. (*Id.*, at p. 672; see also *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260 273-274 [105 Cal.Rptr.2d 674] ["It is well settled that section 425.16 applies to actions arising from statements made in political campaigns by politicians and their supporters, including statements made in campaign literature."].)

Similarly, the Bar Association's evaluation of candidates for judicial office has already been held to be constitutionally protected free speech as everyone "has a right to express . . . views on who is or is not qualified for judicial office." (*Botos v. Los Angeles County Bar Assn.* (1984) 151 Cal.App.3d 1083, 1088-1090 [199 Cal.Rptr. 236].)

█ Roberts contends this case is not about the Bar Association's evaluation, but rather, is about the process of that evaluation. Roberts asserts there is no subterfuge in her suit, it is not one for defamation, the basis of the suit is breach of contract and fraud, and therefore its real purpose is not to chill free speech rights.

Citing *State Farm General Ins. Co. v. Majorino* (2002) 99 Cal.App.4th 974 [121 Cal.Rptr.2d 719], Roberts argues her suit had neither the purpose nor effect of chilling rights. In *State Farm*, the court determined that an insurer's filing of a declaratory relief action to determine coverage under its policy did not constitute a SLAPP suit intended to chill the petition rights of the third party claimants who had sued the insurer's insured because the declaratory relief action did not arise from the personal injury lawsuit. (*Id.*, at pp. 977-978.) *State Farm* is inapposite to the situation in the instant case.

Recently, the California Supreme Court determined there is no intent-to-chill requirement in addition to the "act in furtherance" requirement in order to apply the anti-SLAPP statute. (*Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th 53, 66-67.) The court also rejected imposition of a chilling effect requirement. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75-76 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

In *Navellier v. Sletten* (2002) 29 Cal.4th 82 [124 Cal.Rptr.2d 530, 52 P.3d 703], the defendant had been sued for breach of contract and fraud based on his execution of a release in connection with a prior suit. The court rejected an argument that as the claims were garden variety breach of contract and fraud claims, they were not covered by the anti-SLAPP statute; the court determined the claims were covered because the action arose from the exercise of the constitutional right to petition. (*Id.*, at pp. 90-95.) The court reasoned the focus of the statute is "not the form of the plaintiff's cause of action but, rather, the defendant's activity that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Id.*, at p. 92, italics omitted.)

Accordingly, we conclude that although Roberts's action was an attack on the process of the evaluations, that process was inextricably intertwined with and part and parcel of the evaluations. Thus, the action arose from the Bar Association's exercise of its constitutional right of free speech in connection with a public issue, i.e., to speak out on the qualifications of candidates for judicial office.[2] Accordingly, the court erred in finding the anti-SLAPP statute did not apply to Roberts's action.

III. *Roberts did not establish a reasonable probability of prevailing.*

Because the court decided the statute did not apply, it did not reach the question of whether Roberts had established a probability she would prevail. Nevertheless, we can address that question as it is subject to

---

[2]Hence, we need not address the Bar Association's contention that this action arose from statements in a public forum making it subject to subdivision (e)(5) of section 425.16.

independent review. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

▪ Roberts contends she met her burden of showing a reasonable probability of prevailing as the Bar Association adduced no competent evidence to refute her evidence concerning the breach of contract and fraud. However, it was Roberts's burden to plead and prove her prima facie case.

▪ "In order to establish a probability of prevailing on the claim [citation], a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733], italics omitted.)

▪ Our task of evaluating whether Roberts established a prima facie case is made more difficult because even though she repeats her complaints about the Bar Association's rating process, i.e., she would not have participated if she knew the Bar Association was going to breach its own rules, and the entire proceedings were hopelessly tainted, Roberts provides no fact statement and almost no discussion of the allegations of her complaint or the evidence accompanying her opposition to the anti-SLAPP motion other that to state that her declarations support her allegations. Roberts makes no attempt to refute many of the arguments raised by the Bar Association, in particular she does not explain how without the alleged breaches of contract and false promises she would have received other than a "not qualified" evaluation. Such conclusory argument may be deemed an abandonment of an issue. (See *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 284 [103 Cal.Rptr.2d 71].)

In opposition to the motion to strike, Roberts attached the four declarations from people who knew her (clients, opposing counsel, cocounsel), her resume and her candidate ballot statement that she had submitted to the Committee. In essence, those declarations stated Roberts did not exhibit the negative characteristics noted by the Bar Association. As such, the declarations are not evidence of problems with the evaluation process. Roberts

attached a declaration from another candidate who stated he had not received 48 hours notice of negative comments. Roberts's own declaration detailed her complaints about the Bar Association's evaluation process.

## A. Breach of Contract

Roberts alleged that her written contract with the Bar Association was evidenced by its rules[3] and that there was an oral agreement between chairman Chaleff and herself that no one on her list of disqualified people would participate in any way or be present at the hearings. Roberts alleged her reputation has been damaged by the Bar Association's breach of those agreements.

■ " '[T]he invariable rule [is] pronounced by a legion of cases that damages are not recoverable for mental suffering or injury to reputation resulting from breach of contract.' " (*Frangipani v. Boecker* (1998) 64 Cal.App.4th 860, 865 [75 Cal.Rptr.2d 407].) "Actual damage as opposed to mere nominal damage is another essential element of a cause of action for breach of contract." (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1123, fn. 6 [66 Cal.Rptr.2d 337].)

■ The Bar Association states Roberts made two breach of contract claims—a breach of the 48-hour rule (of notice of negative comments) and a claim the alleged promise that disqualified Committee members would not participate in or be present at the hearings was breached when Olivarez was present during Roberts's appeal presentation.[4] Roberts does not dispute that characterization.

■ "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233 [68 Cal.Rptr.2d 31].)

■ Roberts did not establish how any breach of contract was a proximate cause of damage to her reputation. Although originally Roberts received less than 48 hours notice of the negative comments about her prior to her hearing before the subcommittee, the hearing was rescheduled so that Roberts had more than 48 hours' notice. Roberts also complains new negative comments were raised at the hearing, which she claims was a violation of the rules. However, Roberts had the opportunity to present evidence and arguments in response to all the negative comments at the appeal hearing, thus

---

[3]Although Roberts referred to the rules, her attached exhibit included the Handbook and the Rules.

[4]At the court hearing, the superior court also used the same description of Roberts's claims.

curing any alleged defects in notice. The crux of appellant's complaint is that her reputation was damaged by her "not qualified" evaluation. Roberts does not explain how proper notice would have changed her evaluation.

Roberts alleged that the mere presence of Olivarez at the appeal hearing was indicative of a flawed and improper process. However, Roberts adduced no evidence, and did not plead, how the mere presence of a disqualified committee member at her appeal hearing affected the vote or caused any committee member to evaluate her as "not qualified."[5]

### B. *Injunction and Declaratory Relief*

Roberts does not contest the Bar Association's argument that her cause of action for an injunction was improper as an injunction is a remedy, not a cause of action. (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1159 [69 Cal.Rptr.2d 692].)

"The purpose of a judicial declaration of rights in advance of an actual tortious incident is to enable the parties to shape their conduct so as to avoid a breach. '[D]eclaratory procedure operates prospectively, and not merely for the redress of past wrongs. It serves to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs; in short, the remedy is to be used in the interests of preventive justice, to declare rights rather than execute them.' " (*Babb v. Superior Court* (1971) 3 Cal.3d 841, 848 [92 Cal.Rptr. 179, 479 P.2d 379].) Although Roberts filed her complaint prior to the November 2000 General Election, that election is long past, and Roberts does not claim she has a present contractual relationship with the Bar Association. (See *Travers v. Louden* (1967) 254 Cal.App.2d 926, 929 [62 Cal.Rptr. 654] ["[W]e have found no authority for the proposition that declaratory relief is proper procedure when the rights of the complaining party have crystallized into a cause of action for past wrongs, all relationship between the parties has ceased to exist and there is no conduct of the parties subject to regulation by the court."].) Thus, declaratory relief is not available.

### C. *Fraud*

The fraud cause of action is based on false promises. Roberts alleged that based on the Bar Association's promises, she made an informed

---

[5]In one of Chaleff's declarations, he stated the full Committee, except for members of the district attorney's office, voted on Roberts's evaluation. Chaleff's supplemental declaration states the full Committee voted twice on Roberts's evaluation without making any reference to disqualified members. However, Roberts did not allege disqualified Committee members voted on her evaluation. (Cf. *Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1343 [67 Cal.Rptr.2d 726] [the failure to plead a theory precludes reliance on that theory to defeat summary judgment].)

decision to disclose information and that if she had known it was going to breach its own rules, she would not have participated. Roberts argues her reliance on the Bar Association's representations was justified and caused her injury as the proceedings were so tainted, they resulted in a "not qualified" rating.

 "To plead misrepresentation, the necessary averment is the general statement the promise was made without any intention to perform it, or that the defendant did not intend to perform it. [Citation.] The absence of such a general allegation is ordinarily a fatal defect." (*Tyco Industries, Inc. v. Superior Court* (1985) 164 Cal.App.3d 148, 156 [211 Cal.Rptr. 540].) Roberts did not plead, much less adduce proof, that the Bar Association did not intend to perform the promises at the time it made them.

Moreover, the alleged promises were the same ones alleged in the breach of contract cause of action. Chairman Chaleff[6] submitted a declaration stating that the Committee's vote on Roberts was either unanimous or close to unanimous and that the fact a disqualified member sat through Roberts's presentation was "completely irrelevant and had no impact whatsoever on the vote of the Committee." Roberts adduced no evidence as how 48 hours' notice or the absence of a disqualified committee member (or even members) would have resulted in the Committee members changing their minds and giving her a "qualified" or "well qualified" rating, much less that the election result would have been different.

### DISPOSITION

The order is reversed with directions to the superior court to enter a new order granting the section 425.16 motion to strike. Appellant is awarded costs on appeal.

Perluss, P. J., and Johnson, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 14, 2003.

---

[6]Roberts claims Chaleff did not sign one declaration; however, Chaleff provided a signed declaration prior to the court hearing.