Filed 7/20/22  Lincoln v. Pekary CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WEBSTER LINCOLN et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>ISAIAH CHRISTOPHER PEKARY,<br><br>    Defendant and Appellant. | A162427<br><br>(San Mateo County<br>Super. Ct. No.<br>20CIV05420) |

After defendant Isaiah Christopher Pekary (Pekary) made a number of statements about plaintiffs Webster Lincoln, his mother Niambi Lincoln and his grandmother Katherine Loudd on social media in connection with Webster's campaign for city council, all three sued him for defamation and intentional infliction of emotional distress.  Pekary made a special motion to strike (an "anti-SLAPP" motion") which the trial court granted as to the emotional distress claim but denied as to the defamation claim.  Pekary appeals to the extent his motion was denied.  We affirm.

## BACKGROUND

Webster Lincoln's mother and grandmother, Niambi and Katherine, both served on the board of the Palo Alto Park Mutual Water Company.[1]

---

[1] We refer to the respondents individually by their first names for clarity, and collectively as the "Lincoln family members."

1

Webster, employed as a data scientist for Genentech, has never served on the board.

During Webster's campaign for East Palo Alto City Council in 2020, Pekary made two social media postings about Webster and the Lincoln family members. One was made on the Nextdoor social media site and said: "Don't Vote Webster Lincoln for EPA City Council. . . . Whoever you vote for city council, don't vote for Webster Lincoln. His mother Niambi Lincoln and other family members have been running the Palo Alto Park Mutual Water Company, which is widely known to be a corrupt organization that has preyed upon many people and stolen community funds for many years. Don't let this family get more power to hurt this community." (Boldface omitted.) The post included a link to an online newspaper article about the water company and the Lincoln family members on the board, entitled "Troubled Water[:] Local water company faces allegations of election fraud and company mismanagement." The article mentions Niambi and Katherine by name. The other posting was made on Facebook and was nearly identical (it did not include the first sentence of the Nextdoor post nor did it include the media link).

After the Lincoln family members demanded a retraction, Pekary made two postings on Facebook regarding his statements about Webster. In the posts, Pekary stated "Recently I made a post stating why I would not vote for Webster Lincoln for East Palo Alto City Council. Upon further reflection, I realize now that my post was not fair or loving. I don't personally know Webster Lincoln and I should not have associated him with the actions of the water company. It is my understanding that he is not on the board of the company, nor employed there. I sincerely apologize and, I hope Webster Lincoln that you can accept my apology." In a second post, Pekary stated "it

is my understanding that [Webster] is not on the board of the company, nor employed there and so he is not directly responsible for the actions.  My intentions were to express why I was weary [*sic*] of Webster being elected due to claims of his families['] mismanagement of the water company.  I should have been more mindful of my wording.  For that, I apologize."  He added, however, that "my views on the water company still stand."

After the Lincoln family members again demanded a retraction, Pekary removed the postings and published a retraction on both sites which stated: "I retract my previous statements made about Palo Alto Mutual Water Company."

## DISCUSSION

### *Legal Background*

" ' "The Legislature enacted [Code of Civil procedure] section 425.16 to prevent and deter 'lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'  ([Code Civ. Proc.,] § 425.16, subd. (a).)  Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by ending them early and without great cost to the SLAPP target" ' [citation].  [Code of Civil Procedure] [s]ection 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." ' "  (*Central Valley Hospitalists v. Dignity Health* (2018) 19 Cal.App.5th 203, 216.)  " '[Code of Civil Procedure] subdivision (a) of section 425.16 expressly mandates, the section "shall be construed broadly." ' "  (*Ibid*.)  " '[Code of Civil Procedure] [s]ubdivision (b)(1) of section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of

3

the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." [Code of Civil Procedure] [s]ubdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP. . . .' " (*Central Valley,* at p. 216.)

Code of Civil Procedure section 425.16, subdivision (e) provides "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Thus, a two-step process is used in determining whether an action is a SLAPP. "Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) "Only a cause of action that satisfies both

4

prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, italics omitted.)

We review the grant or denial of an anti-SLAPP motion de novo. (*Park, supra*, 2 Cal.5th at p. 1067.)

### *The Parties' Contentions*

Pekary maintains the trial court erred in its prong two ruling as to the defamation claim in three respects. He maintains the court erred by (a) not determining whether the Lincoln family members were public figures and therefore subject to higher defamation pleading and proof standards, (b) concluding the Lincoln family members met their burden of showing a reasonable probability of success on their claim, and (c) not granting his motion in part.

The Lincoln family members contend, in turn, that the trial court never should have reached the second prong of the anti-SLAAP analysis as the postings did not involve "a matter of public interest" under the particular facts of this case.[2] In any case, they defend the court's prong two rulings as to the applicable defamation standards, their having met their burden to show minimal merit, and the denial of the motion as to the entirety of the defamation claim.

### *Prong One Analysis*

"The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental

---

[2] A "prevailing party on anti-SLAPP motion need not file a cross-appeal to preserve his [or her] disagreement with the trial court's reasoning." (*Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 609.)

matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.) "[C]onsumer information that goes beyond a particular interaction between the parties and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest for purposes of the anti-SLAAP statute." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366.)

The Lincoln family members do not dispute the postings at issue were "made in the context of the political debate involving Webster," but assert they were "not in connection with the public issue surrounding the Water Company." Instead, they claim the postings "involved ongoing controversies between private parties and did not implicate larger issues of public interest or concern." Specifically, and citing to *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122 (*Weinberg*), they maintain the statements about them and the water company were not a matter of public interest because they did not "involve an ongoing controversy on a matter of public significance," but were, instead, related to a private controversy due to Pekary's "ongoing fixation with the manner in which his family was treated in the past."

In *Weinberg*, the parties were token collectors. (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1127.) After the defendant showed a portion of his token collection to the plaintiff, he discovered one was missing. He confronted the plaintiff, who denied he had stolen it. (*Id*. at p. 1128.) The defendant then began "what can be characterized as a campaign to oust plaintiff from the token collecting avocation." (*Ibid.*) He published an advertisement in a monthly issue of a magazine related to token collecting in which he described the disappearance of his token after he showed it to

6

another collector, but he did not identify the plaintiff as the culprit. (*Ibid*.) He later named the plaintiff in "written and oral communications with other token collectors," and sent letters to a small group of token collectors stating the plaintiff took his token. (*Ibid*.) In the letters, he alleged the plaintiff engaged in "misrepresentations, misstatements of fact, and outright lies," and "is a thief and chronic liar." (*Id*. at pp. 1128–1129.)

The plaintiff filed a complaint for libel, slander, and intentional infliction of emotional distress, and the defendant filed a special motion to strike, which the trial court denied. (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1129.) The Court of Appeal affirmed, ruling the defendant "failed to demonstrate that his dispute with plaintiff was anything other than a private dispute between private parties [and] . . . does not establish that he was acting on a matter of public interest." (*Id*. at p. 1134.) Although "the operation of the criminal justice system is a matter of public concern . . . defendant did not report his suspicions to appropriate prosecutorial authorities, criminal charges are not pending against plaintiff, and plaintiff is not involved in the criminal justice system." (*Ibid*.)

The circumstances in this case bear no resemblance to those in *Weinberg*. The postings at issue here were made in online public forums and were regarding matters of interest to the general public, not solely to a small subset of people engaged in an obscure hobby.

As the trial court concluded, "[t]he subject matter of the postings involved the 'public interest' because . . . Plaintiff Webster Lincoln's fitness for public office, and whether local residents should vote for him, is perhaps the quintessential example of an issue of public interest." As to the Water Company and Webster's family members who served on the board, the court concluded "local Water Company customers would indisputably be interested

7

in knowing whether Water Company Board members have been over-charging residents, stealing community funds, or 'preying on people' by providing unsafe water." The trial court did not err in concluding the postings were made in a public forum about a matter of public interest.

***Prong Two Analysis***

To establish a probability of prevailing, a plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 63.) " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 (*Rusheen*).) " '[T]he plaintiff [must] establish a probability he or she will prevail on the claim at trial, i.e., to proffer a prima facie showing of facts supporting a judgment in the plaintiff's favor.' [Citation.] In assessing the probability of prevailing, a court looks to the evidence that would be presented at trial, similar to reviewing a motion for summary judgment; a plaintiff cannot simply rely on its pleadings, even if verified, but must adduce competent, admissible evidence." (*Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 613–614.)

Before considering whether, as the trial court ruled, the Lincoln family members met their burden of showing a probability of success on their defamation claims, we set forth the general legal principles that govern an action for defamation. Defamation " 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 970, quoting 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782.) The

"dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 (*Franklin*), citing *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19 (*Milkovich*).)

"In determining whether the disputed statement communicates or implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to the language of the statement and whether it was understood in a defamatory sense, and then considering the context in which the statement was made. (*Franklin*, *supra*, 116 Cal.App.4th at p. 385.) We focus not on the literal truth or falsity of each word in a statement, but rather on ' " 'whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance.' " ' " (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 790.)

"[E]xpressions of opinion may imply an assertion of objective fact. For example, '[i]f a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.' " (*Franklin*, *supra*, 116 Cal.App.4th at p. 385, quoting *Milkovich*, *supra*, 497 U.S. at pp. 18–19.)

Nor does "characterizing speech as 'political' . . . automatically or entirely exempt it from liability for defamation. 'The [United States Supreme Court] has made clear . . . that even as to public officials, knowingly false statements of fact are constitutionally unprotected.' [Citations.] . . . 'That speech is used as a tool for political ends does not automatically bring it

9

under the protective mantle of the Constitution. . . . Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas. . . ." ' Claims of criminal activity and personal dishonesty also may not be protected." (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 680 (*Balla*).)

Public figures have the burden of proving both that the challenged statement is false and that the defendants acted with actual malice. (*Balla, supra,* 59 Cal.App.5th at p. 675.) "To prove actual malice, a plaintiff must show that statements were made with ' "knowledge that [they were] false or with reckless disregard of whether [they were] false or not." ' [ Citation.] ' "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth," ' and the evidence must be clear and convincing. [Citations.] [¶] '[A]ctual malice can be proved by circumstantial evidence.' [Citation.] Considerations such as 'anger and hostility toward the plaintiff,' 'reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff,' and 'failure to investigate' may, 'in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' [Citation.] Such evidence is relevant 'to the extent that it reflects on the subjective attitude of the publisher.' " (*Id.* at pp. 682–683.)

*Demonstrable Falsity*

The Lincoln family members demonstrated falsity by submitting declarations in opposition to the anti-SLAPP motion in which each declared: "The disparaging statements Defendant Pekary made in his social media posts about me, my family and the Water Company are entirely untrue."

Pekary maintains his statements in the social media posts were opinion and hyperbole, and "not specific enough to imply any false statement of fact."

10

Relying on *ZL Technologies, Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603 (*ZL Technologies*), he points out "general comments that lack any specificity as to time or place of alleged misconduct suggest there is no fact being conveyed by the statement. . . ."

In *ZL Technologies*, the Court of Appeal observed, "overly vague statements [citation] and ' "generalized" comments . . . "lack[ing] any specificity as to the time or place of" alleged conduct may be a "further signal to the reader there is no factual basis for the accusations." ' " (*ZL Technologies, supra,* 13 Cal.App.5th at p. 624.) However, the appellate court went on to explain, "[o]n the other hand, if a statement is 'factually specific,' 'earnest' [citation], or 'serious' in tone [citation], or the speaker 'represents himself as "unbiased," ' ' "having specialized" ' [citation] or ' "first-hand experience," ' or ' "hav[ing] personally witnessed . . . abhorrent behavior" ' [citation], this may signal the opposite, rendering the statement actionable." (*Ibid.*)

The Court of Appeal thus concluded the assertion that there was " '[n]o transparency or accountability for [senior management's] decisions' " was "a generalized conclusion . . . without tying it to specific conduct, or a time and place." (*ZL Technologies, supra,* 13 Cal.App.5th at p. 628.) The court reached the opposite conclusion as to statements that "ZL had a 'practice' of 'hir[ing] people who are fresh out of school with no expertise,' '[n]o organizational chart, job title, or job description[] exist[ed] in [the] company,' . . . employee pay was '30-50% lower than industry standards in Silicon Valley'; . . . ZL management was 'composed of purely family and school-specific friends,' there were '[n]o experienced managers to grow the company,' and management 'belittle[d] [employees] in public . . . cast[ing] aspersions upon them.' " (*Id.* at p. 627.) Thus, with the exception of the first review, all the

11

statements "included one or more specific factual assertions that could be damaging to a business's reputation." (*Ibid*.)

At oral argument, Pekary's counsel maintained this case "rises and falls" with *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944 (*Beilenson*). In that case, Beilenson distributed a campaign mailer regarding his opponent, Richard Sybert, in a campaign for Congress. (*Id*. at pp. 946–947.) The mailer, entitled " 'Rich Sybert Ripped Off California Taxpayers,' " charged that " '[w]hile on the public payroll [at the State Office of Planning and Research], Rich Sybert maintained a private law practice on the side. Sybert's clients included foreign investors, a bank, and an insurance company that had a vested interest in the actions of state government. [¶] Rich Sybert's clients paid him more than $140,000 for providing "legal services." Sybert took this money for representing private interests, at the same time he was taking $98,285 a year from taxpayers whom he was supposed to be serving full time. This was a serious conflict of interest and breach of public trust.' " (*Id*. at p. 947.)

The trial court denied Beilenson's anti-SLAPP motion, indicating "it did not believe [Code of Civil Procedure] section 425.16 to be applicable to political campaigns," and "found that Sybert met his burden of proving there was a 'possibility that [he] will prevail on the claim. . . .' " (*Beilenson, supra*, 44 Cal.App.4th at p. 948.) The Court of Appeal disagreed, noting "[t]here is nothing in the language of [Code of Civil Procedure] section 425.16 that denies its use by politicians." (*Id*. at p. 950.)

The Court of Appeal next concluded Sybert had not made a sufficient showing of the probability of success of his libel lawsuit. (*Beilenson, supra*, 44 Cal.App.4th at pp. 951–952.) As to the " 'rip-off' " statement, the court explained "The mailer here proclaimed it to be wrong for a state official to

12

have an outside job, the implication being that all of the official's time, attention, and energies ought to be devoted to his public post. This conduct, in the opinion of Beilenson, was a 'rip-off." This colorful epithet, when taken in context with the other information contained in the mailer, was rhetorical hyperbole that is common in political debate. [Citations.] As such, the term 'rip-off' was not defamatory." (*Id.* at p. 951–952.) Likewise, as to the statement criticizing Sybert "for representing clients who would stand to profit from their association with him [and] . . . offer[ing] the opinion that such a situation constituted a conflict of interest," the court concluded that, even though Sybert's practice of law while employed as a state official did not violate the law, "a citizen could possess the belief that such a custom violates a higher code of ethical precepts. To charge a breach of ethics is not to charge a breach of the law." (*Id.* at p. 952.) Accordingly, the court concluded "Beilenson's accusations were statements of opinion entitled to the protection of the First Amendment." (*Ibid.*)

Contrary to Pekary's assertion, *Beilenson* did not involve statements that were "worse" than those alleged to be defamatory in this case. As the *Beilenson* court noted, Beilenson's campaign flyer did not state Sybert broke the law, but "opined there had been an unwholesome appearance of impropriety." (*Beilenson*, *supra*, 44 Cal.App.4th at p. 952.) "To charge a breach of ethics is not to charge a breach of the law." (*Ibid.*) Pekary's postings, in contrast, did charge a violation of the law, asserting the Lincoln family members were stealing community funds. This went beyond any protected right to " ' "speak foolishly and without moderation" ' " in political debate. (*Id.* at p. 950.)

Pekary maintains he "did not directly accuse the individual board members of stealing funds," but only accused the Water Company of

13

misfeasance. However, in the social media posts, it is clear Pekary was referring to Lincoln family members stealing funds in their capacity as water company board members and accused Lincoln family members as a group of "hurt[ing] this community." The post asserted Webster's "mother Niambi Lincoln and other family members have been running the Palo Alto Park Mutual Water Company, which is widely known to be a corrupt organization that has preyed upon many people and stolen community funds for many years. Don't let this family get more power to hurt this community." And one of the posts referenced a newspaper article, which named Niambi and Katherine.

The statements made specific factual assertions of criminal activity that could be damaging to the plaintiffs' reputations. The posts were earnest, serious in tone, and suggested Pekary had personal knowledge of the asserted criminal activity. (See *ZL Technologies, supra,* 13 Cal.App.5th at p. 624.) The lack of any specific date or place as to the "stolen community funds" does not render the statements "not specific enough to imply any false statement of fact."

As the trial court ruled, the publications "were 'of or concerning Plaintiffs,' as that term has been used in the context of a defamation claim. The publication(s) refer to Niambi Lincoln by name, and to 'other family members' on the Board, which clearly encompasses Plaintiff [Katherine] Loudd. Further, while the publication(s) did not specifically accuse Webster Lincoln of wrongdoing, Webster Lincoln was the focal point of them, and the alleged defamatory statements were the stated justification for asking people not to vote for him."

14

*Malice*

As to malice, the Lincoln family members point to Pekary's retractions in which he admits the statements were "not fair" and that it was his "understanding that [Webster] is not on the board of the [water] company, nor employed there" and therefore he "is not directly responsible for their actions." In his second posted retraction, Pekary retracted all his previous statements about the Water Company. While he claims his retractions evidence a lack of malice—a claim he did not make in the trial court—malice "focuses solely on the defendant's subjective state of mind at the time of publication." (*Sutter Health v. UNITE HERE* (2010) 186 Cal.App.4th 1193, 1210.)

Additionally, Pekary's declaration in support of his anti-SLAPP motion suggests a failure to investigate the claims of stealing. He states he relied on his awareness of lawsuits against the Water Company "regarding corrupt election procedures for its governing board of directors." He also stated the Water Company has been the subject of "multiple news reports regarding water quality and improper election procedures." Notably, neither Pekary's declaration, nor the attached articles on which he claimed he relied, even mentioned, let alone substantiated, his statement that the Lincoln family members had "stolen community funds for many years."

The Lincoln family members also submitted the declaration of Niambi Lincoln in which she explained Pekary's hostility to the Lincoln family. "The Pekary family has been in a 'feud' with my family dating back to 2014 when [Pekary's parents] stopped paying their water bill because they believed they were being overcharged by the Water Company. [¶] . . . The Pekarys did not pay for their water for 2.5 years, resulting in the Water Company shutting off their water in September of 2017 and the Pekarys engaging in self-help by

15

breaking the lock on the meter, turning the water back on and parking the family truck over the meter so it could not be turned off."

In sum, given the record, the Lincoln family members made a " ' "sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Rusheen, supra,* 37 Cal.4th at p. 1056.) As the trial court observed, "Plaintiffs state under oath the accusation is false and unsupported by any evidence. . . . [Pekary] does not appear to offer any evidence, or even argument, that this accusation is true. Rather, [Pekary] presents evidence of lawsuits alleging the Water Company has been holding unfair/improper Board elections. . . . [Pekary] also cites to public criticisms and complaints that the Water Company has been providing substandard water to residents that does not meet the State water quality requirements. [Citation.] But aside from arguing that his statements should be viewed as opinion/hyperbole, as to the accusation of stealing community funds, [Pekary] does not appear to argue truth as a defense. And [Pekary] has not set forth any defense that defeats the defamation claim as a matter of law . . . nor has [Pekary] shown that any element of the claim cannot be established."

Pekary also claims the trial court "improperly shifted the burden of proof from the Lincoln family to prove malice and instead required Pekary to prove truth." (Capitalization omitted.) It did not. The Lincoln family members met their burden of establishing a prima facie case of defamation. The court did not require Pekary to prove the truth of his statements but noted Pekary did not even claim truth as a defense.

As we have observed, the trial court did not decide whether the Lincoln family members were public figures and therefore subject to the higher defamation pleading and proof standards for such individuals. Pekary

16

maintains this was error, as do the Lincoln family members (who claim they are not required to prove malice).

The trial court did not commit an analytical misstep. As the court observed, the Lincoln family members "appear to concede that Webster Lincoln, as a candidate for public office, was a public figure for purposes of this analysis. . . . The parties' briefing provides no analysis of whether the Board member Plaintiffs [Katherine and Niambi] could be viewed as limited purpose public figures. In any event, the Court need not resolve this issue to rule on the motion. . . . Because [Pekary] does not even appear to defend the accusation of stealing community funds as a true statement, or offer any evidence that he believed it to be true, even if the Board member Plaintiffs could be viewed as limited purpose public figures (an issue the Court does not reach), the Court still could not grant the motion as to the defamation claim."

Given that the trial court correctly concluded the Lincoln family members made a sufficient showing of minimal merit even under the heightened standard applicable to public figures, the court did not err in not deciding whether they are, in fact, public figures. (See *Park, supra,* 2 Cal.5th at p. 1061.)

### *Failure to Strike Portions of Defamation Claim*

Pekary lastly claims the trial court erred in denying his motion as to the defamation claim in its entirety. He points to the following allegations and insists the court should have stricken all the wording except the phrase we have italicized:

> "Whoever you vote for city council, don't vote for Webster Lincoln. His mother Niambi Lincoln and other family members have been running the Palo Alto Park Mutual Water Company, which is widely known to be a corrupt organization that has preyed upon many people

17

*and stolen community funds for many years.* Don't let this family get more power to hurt this community." (Italics added.)

According to Pekary, the trial court "agreed" with him that the alleged statement "regarding the Water company being corrupt and preying on people" was opinion "but disagreed with Pekary's [opinion] arguments regarding the statement about stealing community funds." Thus, Pekary maintains most of the language of the allegation should have been excised from the complaint.

Pekary correctly points out that in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 393, our Supreme Court held that anti-SLAPP motions may be used "to attack parts of a count as pleaded." Such motions, similar to garden variety motions to strike, are "well understood as a way to challenge particular allegations." (*Id.* at 394.)

However, the court did not "agree" with Pekary that only the "stolen community funds" language was actionable. Rather, it stated Pekary "has not shown that the targeted statements, *in their entirety*, constitute opinion/hyperbole. . . . While Defendant may have an argument with respect to the vague accusation that the Board is 'corrupt' and has been 'preying' on people, the Court cannot conclude, for purposes of this motion, that the accusation that Board members have 'stolen community funds for years' constitutes non-actionable opinion or hyperbole." (Italics added.) Moreover, as for the supposedly non-actionable language Pekary claims should have been stricken, *Baral* also made clear that "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to [Code of Civil Procedure] section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral v. Schnitt, supra,* 1 Cal.5th at p. 394.) Here,

18

the additional language is contextual and therefore properly remains in the complaint.

We also note that in his special motion to strike, Pekary sought to strike the "portions of the complaint at page 3, paragraph 9, and Exhibits 'A' and 'B' that rely on this statement: 'His mother Niambi Lincoln and other family members have been running the Palo Alto Park Mutual Water Company, which is widely known to be a corrupt organization that has preyed upon many people and stolen community funds for many years.'" Thus, he did not seek to parse the language of the complaint alleging the defamatory statement and to have the court strike only a portion of it.

## DISPOSITION

The order is affirmed. Respondents to recover costs on appeal.

_____

Banke, J.

We concur:

_____

Margulies, P.J.

_____

Wiss, J.*

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A162427, Lincoln v. Pekary